NO

I 1 2000

NANCY DOHERTY, CLERK

By _____
　　　　　　　　　　 Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **LAWRENCE R. POLINER, M.D.,** | § | **3 - 0 0 C V 1 0 0 7 - D** |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. _____** |
| **vs.** | § | |
| | § | |
| **TEXAS HEALTH SYSTEMS, A TEXAS** | § | **JURY TRIAL DEMANDED** |
| **NON-PROFIT CORPORATION, dba** | § | |
| **PRESBYTERIAN HOSPITAL OF DALLAS;** | § | |
| **and JAMES KNOCHEL, M.D.; CHARLES** | § | |
| **HARRIS, M.D.; ANTHONY DAS, M.D.;** | § | |
| **CHARLES LEVIN, M.D.; DAVID** | § | |
| **MUSSELMAN, M.D.; JOHN HARPER, M.D.;** | § | |
| **ROBERT BROCKIE, M.D.; JORGE** | § | |
| **CHEIRIF, M.D.; STEVEN MEYER, M.D.;** | § | |
| **AND MARTIN BERK, M.D.** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

**LAWRENCE R. POLINER, M.D.**, files this Original Complaint as follows:

### I.

### PARTIES

1.　　Plaintiff, Lawrence R. Poliner, M.D. ("Plaintiff" or "Dr. Poliner"), is an individual

who resides and practices medicine in Dallas, Dallas County, Texas.

2.　　Defendant, Texas Health System ("THS") is a non-profit corporation organized under

the laws of the State of Texas. The sole shareholder of THS is Texas Health Resources, a non-profit

corporation organized under the laws of the State of Texas, with its principal place of business in

**ORIGINAL COMPLAINT** - Page 1

253456 6

Irving, Dallas County, Texas. THS does business as a number of health care facilities including Presbyterian Hospital of Dallas (the "Hospital"), which is a hospital in Dallas, Dallas County, Texas, in the Northern District of Texas. THS may be served by delivering a copy of this Original Complaint to its registered agent Mr. Charles W. Boes located at 600 E. Las Colinas Blvd., #1550, Irving, Texas 75039.

3.    Defendant, James Knochel, M.D., ("Knochel") is a medical doctor licensed to practice in the State of Texas. Knochel was Chairman of the Department of Internal Medicine and an agent of the Hospital at all times referred to herein, and an active member of the Hospital's medical staff. Knochel resides in and his principal place of business is located in Dallas County, Texas in the Northern District of Texas. Knochel may be served by delivering a copy of this Original Complaint to his place of business located at Presbyterian Hospital of Dallas, Chairman, Department of Internal Medicine, 8200 Walnut Hill Lane, Dallas, Texas 75231.

4.    Defendant, Charles Harris, M.D., ("Harris") is a medical doctor licensed to practice in the State of Texas specializing in the field of cardiology. Harris was at all times herein a member of the Hospital's medical staff while maintaining a private medical practice offering cardiology services in the same geographic area as Dr. Poliner and with the same referral base. Harris resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas. Harris may be served by delivering a copy of this Original Complaint to his place of business located at 8210 Walnut Hill Lane, Suite 230, Dallas, Texas 75231-4488.

5.    Defendant, Anthony Das, M.D., ("Das") is a medical doctor licensed to practice in the State of Texas specializing in the field of general, nuclear and interventional cardiology. Das was at all times herein a member of the Hospital's medical staff while maintaining a private medical

**ORIGINAL COMPLAINT** - Page 2

253456.6

practice which offered cardiology services in the same geographic area as Dr. Poliner. Das resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas. Das may be served by delivering a copy of this Original Complaint to his place of business located at CIMA, 7150 Greenville Avenue, Suite 650, LB 40, Dallas, Texas 75231.

6.     Defendant, Charles Levin, M.D., ("Levin") is a medical doctor licensed to practice in the State of Texas, specializing in the field of general and interventional cardiology. Levin was at all times herein a member of the Hospital's medical staff while maintaining a private medical practice offering cardiology services in the same geographic area as Dr. Poliner. Levin resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas. Levin may be served by delivering a copy of this Original Complaint to his place of business located at CIMA, 7150 Greenville Avenue, Suite 650, LB 40, Dallas, Texas 75231.

7.     Defendant, David Musselman, M.D., ("Musselman") is a medical doctor licensed to practice in the State of Texas specializing in the field of general, nuclear and interventional cardiology. Musselman was at all times herein a member of the Hospital's medical staff while maintaining a private medical practice offering cardiology services in the same geographic area as Dr. Poliner. Musselman resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas. Musselman may be served by delivering a copy of this Original Complaint to his place of business located at North Texas Heart Center, 8440 Walnut Hill Lane, Suite 700, Dallas, Texas 75231.

8.     Defendant, John Harper, M.D., ("Harper") is a medical doctor licensed to practice in the State of Texas specializing in the field of cardiology. Harper was at all times herein a member of the Hospital's medical staff while maintaining a private medical practice offering cardiology

**ORIGINAL COMPLAINT** - **Page 3**

253456.6

services in the same geographic area as Dr. Poliner. Harper resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas. Harper may be served by delivering a copy of this Original Complaint to his place of business located at North Texas Heart Center, 8440 Walnut Hill Lane, Suite 700, Dallas, Texas 75231.

9.     Defendant, Robert Brockie, M.D., ("Brockie") is a medical doctor licensed to practice in the State of Texas specializing in the field of general and interventional cardiology. Brockie was at all times herein a member of the Hospital's medical staff while maintaining a private medical practice offering cardiology services in the same geographic area as Dr. Poliner. Brockie resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas. Brockie may be served by delivering a copy of this Original Complaint to his place of business located at 8220 Walnut Hill Lane, Suite 500, Dallas, Texas 75231, or 9330 Poppy Drive, Suite 405, Dallas, Texas 75218.

10.     Defendant, Jorge Cheirif, M.D., ("Cheirif") is a medical doctor licensed to practice in the State of Texas specializing in the field of echocardiography, general and invasive cardiology. Cheirif was at all times herein a member of the Hospital's medical staff while maintaining a private medical practice offering cardiology  services in the same geographic area as Dr. Poliner. Cheirif resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas. Cheirif may be served by delivering a copy of this Original Complaint to his place of business located at North Texas Heart Center, 8440 Walnut Hill Lane, Suite 700, Dallas, Texas 75231.

11.     Defendant, Steven Meyer, M.D., ("Meyer") is a medical doctor licensed to practice in the State of Texas specializing in the field of interventional cardiology.  Meyer was at all times

**ORIGINAL COMPLAINT** - Page 4

herein a member of the Hospital's medical staff while maintaining a private medical practice offering the same medical service in the same geographic area as Dr. Poliner.   Meyer resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas.   Meyer may be served by delivering a copy of this Original Complaint to his place of business located at North Texas Heart Center, 8440 Walnut Hill Lane, Suite 700, Dallas, Texas 75231.

12.    Defendant, Martin Berk, M.D., ("Berk") is a medical doctor licensed to practice in the State of Texas specializing in the field of echocardiography, general and interventional cardiology. Berk was at all times herein a member of the Hospital's medical staff while maintaining a private medical practice offering the same medical service in the same geographic area as Dr. Poliner.   Berk resides in and has a principal place of business in Dallas County, Texas in the Northern District of Texas.   Berk may be served by delivering a copy of this Original Complaint to his place of business located at CIMA, 7150 Greenville Avenue, Suite 650, LB 40, Dallas, Texas 75231.

## II.

## JURISDICTION AND VENUE

13.    This action arises under the laws of the United States.   The jurisdiction of the Court is based, in part, upon its authority under 28 U.S.C. § 1337 to hear "any civil action or proceeding arising under any Act of Congress regulating Commerce or protecting trade and commerce against restraints and monopolies."   Dr. Poliner brings this action under Section 4 of the Clayton Act (15 U.S.C. § 4) to recover damages incurred as a result of violations by the Defendants of Section 1 of the Sherman Anti-Trust Act, (15 U.S.C. §1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 4 and 16) to secure equitable relief against a continuation of those violations.   In addition,

**ORIGINAL COMPLAINT** - **Page 5**

253456.6

jurisdiction is also founded upon a violation of federal law, the Federal Health Care Quality Improvement Act of 1986 ("QHC Act"), 42 U.S.C.A., § 11111 *et. seq.*, due to the Defendants' conducting of a malicious peer review designed to cause economic harm to Dr. Poliner.

14.     At all times relevant to this Original Complaint, Dr. Poliner and Defendants transacted business at the Hospital, further affecting interstate commerce by treating a substantial number of out of state patients, and receiving monies from Medicare, Medicaid, Champus, the Federal Office of Personnel Management (OPM), Health Care programs, Blue Cross/Blue Shield, Worker's Compensation and various private third-party insurance programs. Furthermore, Dr. Poliner and the Defendants purchased, used and sold products and services while engaged in the practice of medicine, including, but not limited to, the purchase of malpractice insurance, equipment and other materials which affect the flow of interstate commerce and which forms an integral part of the interstate distribution of such services and products which are manufactured, sold and flow in a continuous and uninterrupted stream of interstate commerce.

15.     Each of the claims for relief set forth in this Original Complaint are derived from a common nucleus of operative fact involving substantially identical issues of fact and law such that one would ordinarily be expected to try them in one judicial proceeding. Consequently, the entire action constitutes a single case wherein all claims should be combined and tried together in the interests of judicial economy, convenience, fairness and in order to avoid unnecessary duplication and multiplicity of actions. Therefore, this Court has ancillary jurisdiction over all state law claims asserted herein.

16.     Venue is proper in this Court pursuant to 28 U.S.C.A § 1391(b) because Plaintiff resides in this district and because each of the Defendants live and work in this district. Venue as

to each Defendant is proper in this judicial district pursuant to the provisions of Title 15 U.S.C. § 22 and Title 28 U.S.C. §1391(b) and (c) in that each of the Defendants transact business, are registered and/or licensed to transact business and are found in this judicial district. The unlawful activities done pursuant to the conspiracy and course of conduct herein alleged were carried out within the Northern District of Texas, and interstate trade and commerce was and is carried on within the Northern District of Texas.

## III.

## FACTS COMMON TO ALL COUNTS

17.     This is an action for malicious peer review, for conspiracy to restrain competition and inhibit trade, and for denial of due process. It is brought for violations of the anti-trust laws by engaging in conspiratorial activities designed to ensure the cause of termination of hospital privileges and to ensure a lack of competition at the Hospital in the area of cardiology. Dr. Poliner also seeks a declaratory judgment that the process used to summarily suspend his privileges at the Hospital in June 1998 violated his contractual right to a fair process, as guaranteed by the bylaws of the Hospital and of the medical staff. Dr. Poliner also seeks damages for the Hospital's breach of contract, based on the resulting damage of his business and reputation, and well as damages for other related tort and contract claims.

18.     Dr. Poliner specializes in cardiology with subspecialties in the areas of nuclear cardiology, echocardiography, invasive cardiology and interventional cardiology. Dr. Poliner has a widespread reputation and frequently attracts out of state patients.

19.     "Nuclear Cardiology" – is a non-invasive technique using radioactive isotopes to detect relative degrees of blood flow as well as contractility of the heart muscle.

20.     "Invasive Cardiology" – involves a set of procedures involving the use and placement of catheters in the heart to assess blood flow to the heart and function of the heart.

21.     "Interventional Cardiology" – involves techniques utilizing catheters and elements such as balloons or stents, to dilate or remove obstructions located in the coronary arteries.

22.     Each of these specialized areas of cardiology require the use of specialized equipment, documented training and experience.   If a cardiologist is denied the use of facilities that provide such specialized equipment, he or she would be excluded from access to the cardiovascular market.

23.     Defendant, THS provides healthcare services and transacts business affecting the flow of interstate commerce. The Hospital is the third largest hospital in the Dallas/Fort Worth area.  The Hospital also treats a substantial percentage of the cardiology cases in Dallas County, and a substantial portion of all emergency and critical care patients are sent to the Hospital for treatment. The Hospital advertises its hospital as the pre-eminent one in North Texas in treating heart attack patients.  Likewise, other non-critical or emergent care patients in the area are referred by family physicians, internal medicine physicians and cardiologists to interventional cardiologists with medical staff privileges at the Hospital.  A large number of such patients are from out of state.

24.     Defendants were at all times relevant to this Original Complaint, in the business and profession of providing to the consuming public, services, facilities and items related to cardiovascular medical care at the Hospital, all of which involve and affect the flow of interstate commerce.

25.     Defendants, THS, a Texas non-profit corporation, d/b/a Presbyterian Hospital of Dallas, James Knochel, M.D., Charles Harris, M.D., Anthony Das, M.D., Charles Levin, M.D., David Musselman, M.D., John Harper, M.D., Robert Brockie, M.D., Jorge Cheirif, M.D.,  Steven

Meyer, M.D., and Martin Berk, M.D., individually and in concert as part of a conspiracy, acted on their own behalf pursuant to their interests which were independent of their affiliation with the Hospital and which arose from their private practice of medicine. Therefore, these Defendants benefitted personally from their illegal contract, combination and conspiracy which is alleged herein. The Defendants' conduct was, at all times, consistent with their independent interests. These Defendants' presently continue their private medical practices in Dallas County, Texas and remain active members of the Hospital's staff with full medical staff privileges and continue to monopolize the interventional, invasive and nuclear cardiology market. The Hospital itself maintains an active and busy medical service facility, through which patients are admitted for interventional, invasive and nuclear cardiology services, which involves and affects interstate commerce.

26.     Prior to the illegal and anticompetitive conspiracy alleged herein, Dr. Poliner enjoyed a prosperous cardiology practice. Due to Dr. Poliner's skill and specialized training in cardiovascular medicine, in invasive, interventional and nuclear cardiology, and echocardiography, Dr. Poliner received an increasing number of referrals from physicians in Dallas County, Texas, thereby lowering revenues for the Defendants who were his economic competitors.

27.     Dr. Poliner's family has been long established residents of Dallas, Texas. He graduated cum laude from The University of Notre Dame, received his M.D. degree from Cornell University School of Medicine in 1969, and completed a residency in Internal Medicine at the University of Colorado in 1972. He became Board-certified in Internal Medicine in 1972 and in his subspecialty of Cardiovascular Diseases in 1977.

28.     From 1972 to 1974, Dr. Poliner served as Director of Internal Medicine at the United States Air Force base in Lubbock, Texas. From 1974 to 1976, he completed a two-year fellowship

in cardiology at the University of Texas-Southwestern in Dallas. In 1976, Dr. Poliner was invited to join the faculty and became an Assistant Professor of Cardiology at the University of Texas-Southwestern, and worked there until he was recruited in 1979 to be a member of the faculty at Baylor College of Medicine in Houston. From 1979 to 1984, he served as Assistant Professor of Medicine and Director of the Nuclear Cardiology Laboratory in the Department of Cardiology at Baylor, and also served as a consultant to NASA. His research was reported in 17 peer-reviewed publications between 1976 and 1983. During this time, he gained extensive experience in cardiology.

29.    In 1984, Dr. Poliner became Research Director for the Midwest Heart Institute in Wichita, Kansas, where he practiced until 1993 as the group was being sold. At this time, Dr. Poliner concomitantly gained enormous interventional experience with the Galichia Cardiovascular Group. He remained in private practice in Wichita for another year before he was recruited to join a cardiology group based in Indianapolis. He worked for this group in Terre Haute, Indiana from 1994 to 1996, before deciding to return home to Dallas.

30.    In 1996, Dr. Poliner joined Cardiothoracic Surgery Associates of North Texas ("CSANT"), a predominantly cardiovascular surgery group practicing in the Dallas area. He applied for and was granted privileges in cardiology at the Hospital. While at CSANT, Dr. Poliner drew most of his patients from Paris, Texas (which is located about 100 miles northeast of Dallas), and from Southern Oklahoma. As a result, he did not pose a competitive threat to any of the other cardiologists practicing at the Hospital in Dallas.

31.    In May 1997, Dr. Poliner left CSANT to go into solo practice in the Dallas area. He opened his office in the professional building at the Hospital. His solo practice grew quickly, and

**ORIGINAL COMPLAINT** - **Page 10**

for the first time his practice began to draw patients away from the practices of cardiologists practicing at the Hospital and other places in Dallas. His patients came primarily from two sources: (1) the emergency room; and (2) referrals from other doctors.

32.     Until Dr. Poliner's practice began to threaten the practices of other cardiologists at the Hospital, no question had ever been raised - either at the Hospital or at any of the other places he had worked for twenty years - about the quality of his medical care.

33.     From July through December 1997, Dr. Poliner's practice in the Dallas area grew steadily. Prior to May 1998, Dr. Poliner maintained privileges in good standing at the Hospital, to perform nuclear, echocardiographic, invasive and interventional procedures. In response to the competitive threat Dr Poliner posed to them, other cardiologists on the Hospital's medical staff began raising unfounded concerns about Dr. Poliner's clinical skills and judgment, all in an effort to have Dr. Poliner removed from the staff. There was no factual basis to any of those concerns, a conclusion supported by every objective cardiologist (i.e., those not in direct economic competition with Dr. Poliner) who later reviewed Dr. Poliner's cases. The goal of the competing cardiologists was to remove Dr. Poliner as an economic threat by building a case against him and by affecting the termination of his catheterization and echocardiographic privileges at the Hospital. This method of eliminating competition at the Hospital has become a pattern, particularly involving cardiologists. Fearing competition from Dr. Poliner and loss of business, the Defendants entered into a conspiracy with each other to monopolize, or attempt to monopolize, and/or to inhibit competition, in the invasive and interventional cardiology services performed at the Hospital. The Defendants conspired to engage in unfair competition, inhibit trade and competition, and monopolize the relevant market by engaging in a false and malicious peer review action against Dr. Poliner (and

**ORIGINAL COMPLAINT** - Page 11

253456.6

other competing cardiologists), and in an illegal boycott against Dr. Poliner, calculated to cause, and which did cause, the loss of his invasive, interventional and echocardiographic privileges at the Hospital for over seven months. The Defendants also conspired to bring false and malicious peer review by initiating a bogus peer review proceeding, and by thereafter preparing false and malicious reviews of Dr. Poliner's work, all in order to justify the termination of Dr. Poliner's privileges.

34. Beginning in early 1998, because of the unfounded "concerns" raised by his competitors, and in furtherance of the Defendants' conspiracy against Dr. Poliner, some of Dr. Poliner's cases became the subject of an intensifying review. For example, on January 12, 1998, the Hospital's Clinical Risk Review Committee ("CRRC") identified for review two cardiac catheterization cases performed by Dr. Poliner in 1997 (involving patients named *"K"* and *"B"*).

35. On January 20, 1998, one of the two cases, patient *K*, was reviewed at a regular meeting of the Cardiology/Cardiothoracic Mortality and Morbidity Review Committee. At that time the case was closed. The Committee's minutes noted that the case was "not referred for further review."

36. On January 21, 1998, as a result of the CRRC meeting nine days earlier, Dr. Michael Katz, the Chairman of the CRRC, sent a "Confidential Memorandum" with records from both the *"K" and "B"* cases to Dr. James Knochel, the Chairman of the Hospital's Department of Internal Medicine. This memo was never sent to Dr. Poliner for response.

37. In turn, Dr. Knochel assigned the *"K"* case to Dr. Charles Harris and the *"B"* case to Dr. Jose Rivera to review. Both Dr. Harris and Dr. Rivera are cardiologists who are direct economic competitors of Dr. Poliner. On March 5, 1998, Dr. Rivera filled out an Internal Medicine Department "Quality Review Worksheet" on the *"B"* case, in which he criticized Dr. Poliner's care.

**ORIGINAL COMPLAINT** - Page 12

253456.6

Dr. Rivera declared that the case was "not cleared." Dr. Harris reviewed the "K" case, and generated an undated memorandum to Dr. Knochel, expressing a highly critical evaluation of Dr. Poliner's management of the case.

38. On April 13, 1998, the Defendants orchestrated another review of Dr. Poliner's 1997 cardiac catheterization and interventional case (involving a patient name "D"). As a result of this additional review, on April 30, 1998, Dr. Katz sent another "Confidential Memorandum" to Dr. Knochel, with records from the "D" case. Dr. Knochel then sent the case to Dr. Rivera for review, but Dr. Rivera did not complete the worksheet on the case until June 9, 1998. Dr. Knochel never notified Dr. Poliner of the existence of these reviews and never gave Dr. Poliner an opportunity to respond to the concerns.

39. On May 12, 1998, while the foregoing cases were still under review by the CRRC, Dr. Poliner performed a cardiac catheterization and interventions case on a patient named "W". "W", like most of Dr. Poliner's patients who presented through the emergency room, had a life threatening problem. "W" presented to the emergency room with prolonged chest pain suggesting the possibility of cardiac injury. Three hours later, and while still experiencing chest pain, Dr. Poliner was finally able to take "W" to the Cath Lab. During this procedure, the catheterization laboratory equipment malfunctioned, and Dr. Poliner missed seeing part of a previously blocked or "occluded" artery. However, another artery that had several extremely high grade narrowings which were believed to be causing the patient's symptoms on the basis of the evidence at hand was opened and the patient became pain free. Although this was a medically complicated procedure, and even though the patient benefitted from this procedure, the Defendants, and in particular Dr. Knochel, used this event to first place Dr. Poliner's privileges in abeyance, and later to summarily suspend his

**ORIGINAL COMPLAINT** - Page 13

privileges, without affording him the opportunity to explain or defend the incident as required by the Hospital Bylaws. The effect of this summary suspension was to permanently harm Dr. Poliner's professional reputation and to ultimately cause the suspension of privileges at the Hospital.

40.     Dr. Poliner was never informed of these erroneous reviews of the CRRC or given the opportunity to defend himself. All of these cases were eventually cleared by the Risk Review Committee. Nonetheless, Dr. Poliner was never notified and never given the opportunity to respond to the flagrantly erroneous reports. This is a clear departure from the procedure recommended by the quality assurance advisements of the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). JCAHO has advisements regarding quality assurance and the way that concerns that arise in peer review committees should be handled. JCAHO recommends that the physician be allowed an opportunity for a response if a difficulty exists in patient care. Improvement in patient care cannot be achieved if perceived problems are never revealed or discussed with the physician nor can incorrect information ever be corrected if the physician is not informed of the existence of the complaints.

41.     On May 13, 1998, Dr. Knochel summoned Dr. Poliner to his office after 5:00 p.m., and advised Dr. Poliner that despite his excellent record at the Hospital, he was going to put Dr. Poliner's privileges into abeyance. The meeting was attended by Defendants Harper and Levin. During the meeting, Dr. Knochel referred to rumors, insinuations and complaints about Dr. Poliner that had been made by competing cardiologists that were unsubstantiated and were untrue. Dr. Knochel was insulting and denigrating of Dr. Poliner's experience in the cath lab. Dr. Knochel specifically denied Dr. Poliner's long record of interventional experience, expertise and track record of excellent care. Dr. Knochel made these comments in front of Drs. Harper and Levin in order to

**ORIGINAL COMPLAINT** - Page 14

253456.6

attempt to cause ridicule and embarrassment. Dr. Knochel made such disparaging remarks despite his knowledge of the substantial body of documentation that Dr. Poliner had to submit to the Hospital to be credentialed in the cath lab. Credentialing was carried out by the Medical Staff Office for privileges at the Hospital and Dr. Poliner's background and experience was exhaustively verified for accuracy. This material was reviewed by Dr. Knochel.

42.     During the meeting on May 13, 1998, Dr. Knochel demanded that Dr. Poliner agree to sign a letter indicating his acceptance of the abeyance of his privileges for a period of 14 days to allow the Hospital to conduct a limited review of his cases. The abeyance letter was delivered to Dr. Poliner the following day, after 2:00 p.m., with the demand that it be signed and returned by 5:00 p.m. or face termination. Dr. Knochel misrepresented to Dr. Poliner that if he failed to agree, Dr. Poliner would be immediately removed from the Hospital staff. Dr. Poliner was specifically advised that he could not seek legal advice on whether to sign the letter. Despite the recommendations of JCAHO, Dr. Knochel never notified Dr. Poliner of the existence of these supposedly adverse reviews and never gave Dr. Poliner an opportunity to respond to the charges. Dr. Levin and Dr. Harper each told Dr. Poliner that the review "was for his own good" and that "no one is out to get you." Dr. Knochel even told Dr. Poliner that he was doing him a favor by not immediately terminating his privileges. Dr. Knochel made no attempt to understand the facts of the cases and he made no attempt to discern the objective evidence in the care of the patients.

43.     In a May 14, 1998 letter, Dr. Knochel informed Dr. Poliner for the first time that the reason for the abeyance of his cardiac catheterization privileges was the "lack of appropriate assessment and the resultant negative clinical outcome" with patient *"W"* (who in fact had multiple

severe narrowings of one of his coronary arteries opened and became pain free), and a "pattern" of poor quality care.

44.     Prior to signing the May 14, 1998  letter of abeyance, Dr. Knochel had contacted competing cardiologists from the Hospital for the purpose of soliciting them to serve on the to-be-formed committee.  Dr. Knochel conspired with these doctors, advising each of the prospective committee members that Dr. Poliner had a serious problem by telling them that Dr. Poliner's privileges had already been placed in abeyance.  Dr.  Knochel further advised the competing cardiologists to look for evidence that echocardiograms were used as a basis to perform unnecessary cardiac catherizations.  Dr. Knochel further assured  the competitors that their identity would be shielded and that they would be protected in this process.

45.     At the end of the 14 day abeyance period, Dr. Knochel sent a letter by messenger to Dr. Poliner, requesting an additional 14 day extension of the abeyance period.  Dr. Knochel told Dr. Poliner that his privileges would be immediately terminated, and he would be off the staff and no longer a member of the medical staff with no rights accorded by the bylaws and that would be the end of the matter, if he did not agree to the extension.  Accordingly, Dr. Poliner executed the extension agreement, confident still that no adverse findings would result from the review process. Dr. Knochel did not tell Dr. Poliner that this period of time would be used to review approximately 22 additional patients "selected at random" to assess Dr. Poliner's accuracy in interpretation of echocardiograms, as well as getting Dr. Rivera, Dr. Levin and Dr.  Meyer to review the *"D"* case, and Dr. Das to review an additional cardiac catheterization case (involving a patient named *"S"*).

46.     The minutes of the May 20, 1998 meeting indicated that the composition of the committee was planned to avoid including physicians in direct economic competition with Dr.

**ORIGINAL COMPLAINT** - Page 16

Poliner. However, the committee had already been chosen over a week earlier, and included direct economic competitors of Dr. Poliner. The committee minutes further indicate that Dr. Levin and Dr. Harper excluded themselves from the ad hoc committee to avoid allegations that they "targeted" Dr. Poliner specifically for review without justification. In other words, the chief of the section of cardiology and the director of the cath lab, individuals with responsibility for quality in the department, eliminated themselves from the committee because of the "potential for bias", but two members were appointed from Dr. Levin's group (CIMA) and three from Dr. Harper's group (North Texas Health Center) to conduct many of the reviews. Dr. Harris was a solo cardiologist who practices in cardiology but who did very little invasive and no interventional work at the time of the reviews and sent his patients needing intervention to North Texas Heart Center.

47.    The review focused on cases that utilized diagnostic tests that yield high economic return, including cardiac catherization, interventional work, and echocardiography. All but one of the individuals who performed the reviews were direct competitors of Dr. Poliner for this work. Dr. Reardon, the one physician who was not in significant competition with Dr. Poliner, found nothing wrong with any of Dr. Poliner's work. Each of the competing cardiologists who served on the committee found substantial problems with Dr. Poliner's work, and recommended that his privileges be suspended.

48.    In the minutes of the Internal Medicine Advisory Committee on May 27, 1998, it was recommended that an outside reviewer be asked to review the cases in order to obtain the most objective review of Dr. Poliner's practice patterns. Despite this express recognition of the need for an unbiased, outside review, Dr. Knochel ignored the recommendation and proceeded with the inquiry solely with the use of direct competitors of Dr. Poliner. The minutes also reflect the

**ORIGINAL COMPLAINT** - Page 17

253456.6

recommendation that Dr. Poliner's echo privileges would also be included in the abeyance. Despite this recommendation, Dr. Poliner was never advised that his echocardiograms were being reviewed.

49. Because of the onerous consequences of a summary suspension, the Hospital is obligated by its own Bylaws and principles of fairness and due process to conduct a balanced and "reasonable review" during the abeyance period. Beginning on May 14, 1998, Presbyterian Hospital had 30 days to conduct such a review in order to determine whether Dr. Poliner's quality of medical care was so sub-standard as to meet the standard for a summary suspension (i.e., that Dr. Poliner's patient care "constitutes a present danger to the health of his patients.") In order to fulfill its obligations under the Hospital Bylaws, the Defendants submitted Dr. Poliner's cases to his economic competition for review rather than independent, unbiased outside reviewers (who would have concluded, as did every unbiased reviewer of Dr. Poliner's work, that Dr. Poliner's work was well within the standard of care). Instead, the Defendants ensured that extremely harsh and erroneous judgments would be made, and that a summary suspension would be imposed and Dr. Poliner's reputation would be harmed. Up to this point Dr. Poliner still had not been informed of the reason for the abeyance of his cardiac catherization and interventional privileges, and he was never informed prior to the letter of suspension that his echocardiographic privileges were under review.

50. Turning the process over to Dr. Poliner's competitors for summary suspension, and labeling him a dangerous doctor, was not a "reasonable review" as contemplated by Article VIII, Part C, Section 3 of the Medical Staff Bylaws. Over the course of the review of Dr. Poliner's cases, every unbiased reviewer (including the one member of the ad hoc committee who was not a significant competitor) concluded that Dr. Poliner's work was consistent with the standard of care. In contrast, every economic competitor who reviewed the same cases reached very different - and highly critical

**ORIGINAL COMPLAINT** - **Page 18**

253456 6

- conclusions. This underscores the policy underlying the Federal Health Care Quality Improvement Act (and codified in Article IX of the Medical Staff Bylaws) that peer review should be conducted by practitioners who are not economic competitors - i.e., by persons with no economic interest in the outcome of the proceedings. The policy recognizes that one's professional judgment cannot help but be affected when he or she has an economic interest in the outcome.

51.     Between May 20-29, 1998, members of the ad hoc committee reviewed 46 of Dr. Poliner's cases and criticized his care of 29 of them (63% of the total reviewed). Not one of these cases except *"K", "D", "B"* and *"W"* had been mentioned by the CRRC during the regular quality assurance review process. Dr. Meyer reviewed nine cases, and did not find a single one that met "a reasonable standard for an interventionist in our community," and recommended many for further review by the Director of the Cath Lab. Dr. Das reviewed nine cases and found Dr. Poliner's care in four of them to be unacceptable. Dr. Cheirif reviewed five cath lab cases, and concluded that Dr. Poliner's care of three did not meet the standard of care and referred the other two to the Director of Cath Lab. Dr. Harris reviewed nine cases, and found that Dr. Poliner's care did not meet the standard of care or expressed concern in six of them. Dr. Brockie reviewed seven cases, and found Dr. Poliner's care unacceptable and/or recommended further review by the Director of the Cath Lab in all of them. The only member of the ad hoc committee who concluded that Dr. Poliner's care met the reasonable standard for an interventionist in the community was Dr. Reardon, who reviewed seven of Dr. Poliner's cases. Note, importantly, Dr. Reardon does not significantly compete with Dr. Poliner for patients.

52.     Between June 1-8, 1998, Dr. Cheirif and Dr. Berk (both of them competitors of Dr. Poliner) reviewed Dr. Poliner's echocardiogram interpretations in 32 cases - 22 additional cases

**ORIGINAL COMPLAINT** - Page 19

pulled "at random," plus 10 from the group of approximately 46 cardiac catheterization cases previously reviewed. On June 8, Dr. Harris cleared the "D" case. On June 9, Dr. Rivera finished his review of the "D" case (and did <u>not</u> clear it).

53.     The reviews performed by members of the ad hoc committee of competing cardiologists demonstrated massive hostility and intent to harm by misrepresentation, falsification and fraud. Their advisements concerning patient care did not conform to the standards advised by the American College of Cardiology and frequently advocated actions which, if taken, would constitute malpractice. The care advocated by many of the reviewers, if actually followed by Dr. Poliner, would have resulted in harm or death to many of the patients. The reviews were so blatantly bad that they demonstrate they were intentionally flawed and malicious.

54.     On June 9, 1998, Dr. Poliner received a letter "outlining the concerns" expressed by the IMAC regarding several cases it had reviewed and enclosing a copy of a summary of the critique of his cardiac catheterization work by unidentified reviewers. In the letter, Dr. Poliner was told he would be given one hour to respond to the criticism on 29 cases at a meeting of the IMAC that Dr. Knochel scheduled just 48 hours later - on the morning of June 11, 1998. Dr. Poliner's request for more time to prepare his response was summarily denied. An opportunity for Dr. Poliner to meet and discuss the cases with the reviewers, to defend, refute or deny the charge, was likewise denied despite the fact that the bylaws require that a physician be advised of an investigation and have the opportunity to interview the ad hoc investigating committee.

55.     On June 11, 1998, Dr. Poliner appeared before the IMAC and was given less than one hour to defend his work in 29 cases. Dr. Poliner began by emphasizing that his patients were often not the usual office practice patients; rather, they were acutely ill patients that come to him

<u>**ORIGINAL COMPLAINT**</u>  - **Page 20**

253456 6

through the Emergency Room. Dr. Poliner gave each member of the IMAC copies of the criticisms that had been made of his cases and had been presented to him by Dr. Knochel so they could see exactly what the cardiologists alleged about his care. Then using prepared text, Dr. Poliner specifically addressed the criticisms of each case, demonstrating why the criticisms were not correct. Dr. Knochel became frustrated by Dr. Poliner's efforts to cover all of the cases and by the documentation provided by Dr. Poliner, such that he became mad and enraged by the end of the meeting. Dr. Poliner also demanded that an outside reviewer be employed to review the cases, rather than the competing cardiologists. This request was also refused. The meeting was a sham. It was form over substance. There was no effort on the part of Dr. Knochel or the other members of IMAC to actually listen to what Dr. Poliner was saying about the cases. There was no effort on the part of Dr. Knochel or the committee to actually consider that Dr. Poliner could be correct or that he could possibly explain any differences of medical opinion. No reasonable effort to discover the truth was made. The committee had made up its mind, and the meeting was perfunctory. At the Medical Review Hearing later, Dr. Knochel admitted under oath that at the meeting, the committee did not care what Dr. Poliner had to say because "he didn't agree with us." The sole voting cardiologist on the IMAC, Dr. Musselman, arrived twenty (20) minutes late for this meeting, and therefore missed a large portion of Dr. Poliner's presentation.

56.     Importantly, there was no evidence that Dr. Poliner's care of his patients was outside the standard of care. In fact, the outcomes in Dr. Poliner's cases exceeded the norm for the Hospital's department of cardiology and the national averages.

57.     Dr. Knochel knew, or should have known, that the charges leveled against Dr. Poliner were false. He knew, or should have known, that a group of competing cardiologists had set out to

**ORIGINAL COMPLAINT** - Page 21

eliminate Dr. Poliner from the staff, and he facilitated it and encouraged it and ensured that it occurred. Dr. Knochel chose people who had demonstrated hostility towards Dr. Poliner to perform the reviews. This action facilitated inhibition of competition at the Hospital.

58.     Summary suspension is designed to remove the doctor from all hospitals everywhere, and is required to be reported to the National Practitioners Data Bank, such that all hospitals across the country will have notice that Dr. Poliner was considered a "dangerous doctor." Because the Hospital was aware that the summary suspension was brought for an improper purpose, it did not report Dr. Poliner to the Data Bank, despite its obligation to do so. In addition, the Hospital has now changed its bylaws to specifically address this issue and others raised by the mishandling of the Poliner peer review.

59.     On June 12, 1998, Dr. Knochel sent Dr. Poliner a letter summarily suspending his cardiac catheterization lab privileges and his echocardiogram privileges. This was the first time that Dr. Poliner had any notice that his echocardiogram privileges were being investigated and evaluated. The letter stated that the summary suspension was based on a review of Dr. Poliner's "performance in the Cardiac Cath Laboratory" and a "subsequent review of [his] interpretations of echocardiograms by an ad hoc committee of six cardiologists of the Internal Medicine Advisory Committee." The letter referred to a "report" of the ad hoc committee that was provided to the members of the IMAC, and that the members of the IMAC recommended summary suspension of Dr. Poliner's privileges "because of the number of cases that did not meet an acceptable standard of care." The letter stated that "these deficiencies reflect delivery of substandard patient care . . . and pose a risk to patient safety that necessitates . . . this formal corrective action." The letter of summary suspension written by Dr. Knochel made false and misleading statements regarding factual

**ORIGINAL COMPLAINT** - Page 22

253456.6

elements of patients' care that can only be construed as intent to harm and fraud. For example, Dr. Knochel mischaracterized elements of a patient with a heart attack who went into cardiogenic shock with statements that cannot be found in the medical records. Allegations were made in the letter that have absolutely no factual backing, and which the national experts who testified at the review hearing found to be in significant error. The letter was written to destroy Dr. Poliner's career, without regard to the truth.

60.     Pursuant to the bylaws of the Hospital, summary suspension is generally reserved for a doctor who, through some physical or mental defect, has become impaired and dangerous to his patients. Although no evidence of impairment or danger to patient care existed, Dr. Knochel summarily suspended Dr. Poliner from practice. He did so without the use of any outside reviewer, relying solely on the intentionally flawed and biased reviews of economic competitors.

61.     Reviews from the ad hoc cardiologists labeled Dr. Poliner's patients as not having received proper care. In this population of critically ill individuals, the majority of whom presented to the Emergency Room acutely ill, the patients did well with the interventional treatment given by Dr. Poliner and went home improved. How is it possible that such a critically ill population of patients would do so well despite being so mistreated? How is it that the reviewers said Dr. Poliner fixed the wrong vessels, when the patients got better and went home?

62.     Dr. Knochel is not a cardiologist but took action to ensure elimination of Dr. Poliner (and other cardiologists) from the medical staff ultimately benefitting the two established groups at the Hospital and those physicians who are his friends. Peer review has been used as a weapon by the two established groups, with Dr. Knochel as the head soldier.

63.     Pursuant to Article IX ("Hearing and Appeal Procedures") of the Medical Staff Bylaws, Dr. Poliner requested a hearing on the summary suspension of his privileges. Due to various procedural delays utilized by the Hospital, the hearing did not commence until November 3, 1998. The hearing committee heard the matter on the evenings of November 3, 4 and 5, 1998. At the hearing, Dr. Poliner was given approximately nine hours to defend his work in over 30 cases. Dr. Poliner's request for additional hearing time was denied. Although he was told he could have additional time, he was told it could be weeks or months before the panel could be reassembled for additional presentation. Accordingly, Dr. Poliner was required to pare his case down in order to fit within the allotted time. Many of Dr. Poliner's scheduled witnesses could not testify because of the time constraints imposed by the Hospital.

64.     During the hearing, Dr. Poliner presented evidence from nationally known experts in the field of cardiology, each of whom testified without equivocation that Dr. Poliner's care of his patients met or exceeded the standard of care. Each testified that the summary suspension was not warranted. Each of these experts testified that Dr. Poliner should be reinstated.

65.     The Hospital presented the testimony of Dr. Richard Lange, a well-known cardiologist who frequently testifies against other doctors in both peer review proceedings and in medical malpractice lawsuits. Dr. Lange's testimony was as bogus as the underlying reviews. Although he failed to admit it, he essentially "adopted" the underlying reviews performed by the competing cardiologists who served on the committee, without conducting a full factual investigation of the cases. Dr. Lange has testified on at least three occasions at hearings to revoke the privileges of doctors at Presbyterian and other hospitals.

66.     The reviews performed by the Defendants, as well as those performed by Dr. Lange, were so erroneous that the only logical conclusion to be drawn was that they were prepared for a malicious purpose.   The reviews were inaccurate, biased, arbitrary and unreliable.   The reviews, themselves, were so totally unfounded so as to demonstrate *malice per se.*

67.     The Hearing Committee made its findings and recommendations in a Report to the Medical Board (the governing committee of the medical staff) dated November 9, 1998.  In a letter dated November 20, 1998, Dr. Poliner was notified of the decision of the Medical Board.  Most significantly, the Medical Board decided that Dr. Poliner's cardiac catheterization lab and echocardiogram privileges should be restored.  In the written opinion of the Review Board, drafted by the Hospital's attorneys, it was also stated that Dr. Knochel's summary suspension of Dr. Poliner's privileges should be upheld, "based on the evidence available to him at the time."  This finding was yet another attempt by the Hospital to shield the peer review process from litigation by attempting to justify the decision of Dr. Knochel to summarily suspend Dr. Poliner.  The Medical Board also recommended that Dr. Poliner be required to have mandatory consultation with another cardiologist for the first 30 cases he performed in the cardiac catheterization lab.  However, on December 16, 1998, the Medical Board made a material change to its original recommendation and removed the mandatory consultation provision.  Instead, it substituted a routine retrospective review of Dr. Poliner's first 30 cardiac catheterization lab cases, along with the review of 30 other cases chosen at random from the cardiology department and performed by an agreed upon reviewer.

68.     Dr. Poliner's privileges were finally restored on December 17, 1998, over seven months after initially being held in abeyance.  However, because of his concerns about the permanent effects of the summary suspension remaining on his record, Dr. Poliner appealed that portion of the

**ORIGINAL COMPLAINT** - **Page 25**

253456 6

Medical Board's findings which concluded that the summary suspension was initially warranted. The appeal was made to the Committee on Professional Affairs (COPA) of the Board of Trustees of Texas Health System, pursuant to Article IX, Part D of the Medical Staff Bylaws.

69.     Both Dr. Poliner and the Medical Board (his adversary in the appeal) submitted written statements to the COPA. In his written statement, Dr. Poliner expressed concern - accurately - about the effect of the summary suspension remaining on his record:

> The presence of this suspension on my record continues to be injurious to me as it [must be] reported to managed care companies, hospitals, malpractice insurers, and licensing boards. I desire that the summary suspension be expunged from my record as it has no foundation or merit.

In its written statement, the Medical Board represented - inaccurately and misleadingly - that Dr. Poliner's concern were unfounded:

> One of Dr. Poliner's biggest misstatements is on the last page of his Written Statement. Dr. Poliner states that the suspension of his Cardiac Cath Lab and echocardiography privileges is being or has been reported to managed care companies, hospitals, malpractice insurers, and licensing boards. That is simply not the case. Since the suspension was not a final action, and all of Dr. Poliner's privileges will be reinstated once appeal becomes final, no report whatsoever was or will be generated and provided to any state or federal agency regarding this matter.

This is highly misleading representation. In fact, the Hospital has reported Dr. Poliner's summary adverse action and continued surveillance of his cases to another hospital at which Dr. Poliner applied for privileges. Privileges were declined at that hospital. In addition, Dr. Poliner must himself report it when applying for privileges or attempting to be included in managed care contracts. The confidential peer review proceeding was reported to another hospital before a final determination had been reached. The hospital then contacted Dr. Poliner regarding the events at the Hospital.

70.     The COPA heard the appeal on March 2, 1999, and by March 8 decided to uphold the summary suspension - on the grounds that it did not have the authority to set aside the summary suspension. The Board of Trustees was obligated within 30 days after the conclusion of the appellate review (in this case, by April 8, 1999), to issue its decision. However, it was not until June 7, 1999 that it decided to uphold the COPA's findings, and not until July 7, 1999 that Dr. Poliner was finally notified of the Board of Trustee's decision.

71.     The "concerns" raised about Dr. Poliner's work were without merit, as reflected by the fact that his privileges were restored in full. However, the fact that his privileges were wrongly subject to a summary suspension for a period of more than seven months has caused severe damage to Dr. Poliner's medical practice. The routine 30-case review of Dr. Poliner's cardiac catheterization lab cases, which under normal circumstances would have been completed within six months, has yet to be completed. As a result, any hospital at which he applies for privileges is told both that his privileges had been summarily suspended and that his work remains under review, which casts strong doubt on his professional credentials and severely impairs any opportunity to obtain cardiology privileges at other hospitals.

72.     Dr. Poliner's cardiology practice has been ruined. He has been labeled as a dangerous doctor by the Hospital. The peer review process was not secret. The fact that Dr. Poliner was summarily suspended was quickly "leaked" to the medical community. Immediately, Dr. Poliner's referral sources dried up, and have to this date not returned. Quite simply, primary care physicians are afraid to send their patients to a cardiologist whom the Hospital has labeled "dangerous," despite the fact that Dr. Poliner's privileges were reinstated. The other doctors simply assume that Dr.

Poliner "got off" or "had good lawyers," or that it is simply two risky to send patients to him, not that Dr. Poliner was actually innocent of the charges leveled against him.

73.    Despite being cleared by the review board and despite the testimony of a large number of nationally recognized cardiologists at the hearing, Dr. Knochel is still insistent on terminating Dr. Poliner from the medical staff at the Hospital. Dr. Knochel has continued to "monitor" the activities of Dr. Poliner, hoping that he will make some type of medical mistake that he can again use as the basis for a peer review action. In that respect, Dr. Knochel has recently sent Dr. Poliner another letter, dated May 5, 2000, indicating that Dr. Poliner is under review for a case involving patient "M", whom Dr. Poliner was asked to supervise on an exercise stress test. The stress test was conducted over six months prior, but Dr. Knochel recently initiated the investigation of this patient. This action on the part of Dr. Knochel demonstrates that the conspiracy to terminate Dr. Poliner from the staff at the Hospital continues.

74.    Dr. Poliner files this suit to stop Dr. Knochel, the Hospital, and the other competitors named as Defendants, from continuing their effort to terminate Dr. Poliner's privileges at the Hospital based on false and malicious peer review, all in an effort to control the market and inhibit competition in violation of law. The suit is also brought to seek the return of Dr. Poliner's good reputation and name in the medical community. Finally, this suit is brought to obtain financial payment from the Defendants who have ruined Dr. Poliner's career.

## IV.

## CAUSES OF ACTION

### COUNT 1

### COMBINATION AND CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT

### (All Defendants)

75.     The statements and allegations contained in paragraphs 1-74 are incorporated herein by reference as though fully set out herein.

76.     Beginning at least as early as April 1998, the exact date being unknown to Dr. Poliner, and continuing thereafter up to and including the date of the filing of this Complaint, the Defendants have conspired to inhibit trade and competition in violation of § 1 of the Sherman Act, 15 U.S.C. §1, by engaging in an unlawful combination and conspiracy to blacklist and boycott Dr. Poliner, by first placing his privileges in abeyance with due process, and then by summarily suspending him from the practice of echocardiography and cath lab at the Hospital.

77.     Dr. Poliner has suffered the type of injury the anti-trust laws were intended to prevent and that flows from that which makes the Defendants' acts unlawful. The injury reflects the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation.

78.     Dr. Poliner's injury and damages coincide with the public detriment tending to result from the violation. The effect of the conspiracy is a diminution in competition in the field of cardiology at the Hospital specifically and in the Dallas/Ft. Worth market. This is particularly true in light of the fact that managed care contracts are in existence which require patients to see only certain doctors, and often limit the patients' choice to a select hospital. Thus, the consuming public

that is part of a managed plan may not be able to use Dr. Poliner because their plan will not allow them to do so except at the Hospital.

79.     In addition, the summary suspension was a black mark on Dr. Poliner's career, which he will always be required to disclose on health care related applications, and which will inhibit or prevent him from obtaining privileges in other hospitals.

80.     Dr. Poliner's privileges were terminated by the Hospital as a result of false and malicious peer review.   The competitive significance of Dr. Poliner's exclusion from the Hospital must be measured, not just by the particularized evaluation of his own practice, but also by a general evaluation of the impact of the restraint on other participants and potential participants at the Hospital.   It is believed that greater than 95% of care in cardiology at the Hospital for patients residing in Dallas is delivered by CIMA and North Texas Heart Center.   Primary care physicians have contractual relationships with System Health Providers, a contracting agency for physicians at the Hospital with insurance and managed care companies.   Accordingly, the majority of general cardiology care in this immediate environment is provided by Dr. Harper, Dr. Cheirif, Dr. Musselman, Dr. Meyer and two others at North Texas, and Dr. Das, Dr. Levin, Dr. Berk and one other at CIMA.   Of those ten (10) doctors, seven (7)  were involved in the peer review process against Dr. Poliner that resulted in his summary suspension. They are competing cardiologists in the same hospital system. After the elimination of Dr. Poliner, both CIMA and North Texas added additional cardiologists to help with the increased patient load.

81.     Prior to his suspension, Dr. Poliner received a large portion of his work from the emergency room.  Emergency room work is sought after and is economically advantageous to cardiologists because it represents income-generating procedures.  Patients who present to the

ORIGINAL COMPLAINT - Page 30
253456.6

emergency room often need tests such as echocardiograms, exercise tests, exercise or dobutamine echocardiograms, exercise nuclear studies, adenosine stress nuclear studies, cardiac catherizations and/or interventional work. Dr. Poliner was trained in and performed each of these procedures. The emergency room also represents an important source for complying with the Hospital's minimum requirements for number of procedures/per year. Emergency room patients often need follow up care as well. The emergency room is also a traditional location for physicians, especially cardiologists, beginning in practice to seek patients since they do not have an established referral base.

82.     Soon after his summary suspension, Dr. Poliner was removed from the emergency room cardiology call schedule and calls from the emergency room decreased dramatically. Participation in the call schedule was controlled by Dr. Harper. After he was reinstated, the initial January, 1999 emergency room cardiology call schedule did not include Dr. Poliner. After Dr. Poliner voiced complaints to the Hospital, the emergency room cardiology call schedule was amended to include Dr. Poliner. Despite his inclusion on the emergency room list, Dr. Poliner now rarely receives any calls to the emergency room at the Hospital. It appears that the two competing groups at the Hospital also control access to the emergency room, and attempt to eliminate or stifle competition in that fashion as well. Dr. Poliner gets virtually no business from the emergency room, and his referral base has all but disappeared.

83.     Although the boycott of Dr. Poliner has no obvious effect on interstate commerce, the proper focus is upon the potential harm that would ensue if the conspiracy were successful rather than upon the actual consequences. The essence of any violation of §1 of the Sherman Act is the illegal agreement itself, rather than the overt acts performed in furtherance of the agreement that is relevant.

**ORIGINAL COMPLAINT** - **Page 31**
253456.6

84.     In addition, because the conspiracy was actually successful. Dr. Poliner was summarily suspended from practicing his cardiology specialities of echocardiography and cath lab, which represented over 90% of his practice, and which effectively put him out of business.   As a matter of practical economies, there was a reduction in the provision of cardiology services in the Dallas market. The Defendants conspired with others to abuse the peer review process and thereby deny Dr. Poliner access to the market for cardiology services provided by the Hospital. The "peer review process" was the "gateway" that controls access to the market for services.

85.     During the period of his abeyance and suspension, and continuing today, Dr. Poliner is restrained in his ability to make his high quality services readily and fully available to the public; therefore the public need for cardiovascular medicine and related healthcare services will not be met.

86.     Dr. Poliner was deprived of access to the Hospital's cardiac catherization and echocardiographic facilities thereby denying patients, many of whom are beneficiaries and recipients of Medicare, Medicaid, insurance contracts, and other third-party reimbursement, the opportunity to seek the services of Dr. Poliner.

87.     Defendants have depleted the resources of Dr. Poliner who, even where granted his due process rights privileges, and review requested, has expended the financial resources required to remain in business or to compete successfully in resisting or overcoming the Defendants' conspiracy.

88.     Defendants have delayed the ultimate granting of due process rights, privileges, and review so as to damage severely Dr. Poliner's ability to compete or remain in business.

89.     The effect of the combination and conspiracy has been and will be, among other things, to prevent and restrain competition in the furnishing of interventional, nuclear and echocardiographic cardiology services to the public.

90.     As a direct and proximate result of the aforesaid combination and conspiracy, Dr. Poliner has expended considerable sums of money which he would not otherwise have been required to spend due to the necessity of overcoming the illegal attempts by the Defendants to deny Dr. Poliner his right to practice interventional cardiology at the Hospital.

91.     As a result of the combination and conspiracy to restrain trade and competition by the Defendants, Dr. Poliner has been caused to suffer and will continue to suffer substantial damages to his reputation and practice, all to his detriment.

92.     The Defendants concerted efforts to eliminate Dr. Poliner as a competitor constitutes a group boycott in violation of Section 1 of the Sherman Act. By eliminating Dr. Poliner as a competitor, the boycott successfully reduced competition for the Defendants' and their cardiology groups during the term of the summary suspension and continuing today.

93.     Dr. Poliner is unable at this time to state finally the amount of damages sustained to date and those to be sustained in the future by reason of the illegal acts of Defendants as set forth herein. Dr. Poliner would show that, but for the illegal combination and conspiracy of the Defendants as alleged herein, as of the date of the filing of this lawsuit, he has suffered damages in an amount in excess of $1,000,000. Dr. Poliner is further entitled to three times the damages determined to have been sustained, simple interest on actual damages as allowed by law, costs of suit and attorney's fees for the trial or hearing in this Court, an additional amount in the event an

**ORIGINAL COMPLAINT** - **Page 33**

253456.6

appeal is taken to the Court of Appeals, and an additional amount for an appeal to the United States Supreme Court.

94.     The Defendants conspired with one another to monopolize or attempt to monopolize the nuclear, invasive and interventional cardiology services in the relevant market in Dallas, Texas in violation of 15 U.S.C.A. §§ 1 and 2. The Defendants have conspired to restrain competition and inhibit trade, including denial of competitive advantages or opportunities, in violation of 15 U.S.C. §15 and §26.

95.     The Defendants conspired with one another to perform false and malicious peer review against Dr. Poliner in order to cause the loss of his privileges to perform cardiovascular procedures at the Hospital. They did so by using and performing reviews by persons who were unqualified and/or who were biased competitors and who were motivated by anti-competitive intent.

96.     These reviewers published false and inaccurate written reviews, in many cases contrary to well-established medical principles, for the purpose of harming Dr. Poliner, all in an effort to pursue their anti-competition goal of causing the loss of privileges. Dr. Poliner was forced to consent to an abeyance of his practice under the threat of immediate termination from the Hospital medical staff. Further, the Hospital subsequently retained an outside reviewer who adopted the same falsehoods and inaccuracies as in their internal review. The Hospital knew Dr. Lange would provide favorable testimony, as he had done in previous peer review actions against other cardiologists.

97.     Defendants have knowingly, willingly, and maliciously sought to destroy Dr. Poliner's reputation and medical practice in order to inhibit or restrain competition from Dr. Poliner. This is a pattern of conduct which can be established by the testimony of other doctors and

**ORIGINAL COMPLAINT** - Page 34

253456 6

competitors. Such conduct requires an award of exemplary damages, treble damages and attorneys fees against the defendants, in order to discourage such conduct in the future.

98. Dr. Poliner is entitled to recover threefold the damages he sustained, and the cost of suit, including attorneys fees, pursuant to Section 4 of the Clayton Act. 15 U.S.C.§15 (1988). In addition, pursuant to Section 16, Dr. Poliner seeks declaratory and injunctive relief as prayed for herein. 15 U.S.C. §26 (1988).

## V.

## COUNT 2

## TEXAS FREE ENTERPRISE AND ANTI-TRUST ACT OF 1983

### (All Defendants)

99. The statements and allegations contained in paragraphs 1-98 are incorporated by reference as though fully set out herein.

100. Beginning at least as early as April 1998, the exact date being unknown to Dr. Poliner, and continuing thereafter up to and including the date of filing of this Original Complaint, the Defendants, as set forth herein, have engaged in an unlawful combination and conspiracy in unreasonable restraint of trade and commerce, in violation of the Texas Free Enterprise and Anti-Trust Act of 1983 § 15.05(a) of the Texas and Business Commerce Code, in furnishing of healthcare services and has maintained contracts and agreements in unreasonable restraint of trade and commerce. Said violations have consisted of continuing contracts, agreements, understandings, concert of action, and course of conduct among Defendants as co-conspirators to do, among other things, the following:

    a.      inhibit competition by Dr. Poliner in the areas of interventional and invasive cardiology in the Dallas/Ft. Worth area;

    b.      otherwise allocate customers in such trade or commerce among themselves;

    c.      foreclose the market for interventional cardiology medical services to competitors such as Dr. Poliner and prevent Dr. Poliner from competing for a expanded share of the relevant market;

    d.      not compete in such trade or commerce.

101.    The effects of the aforesaid facts, singularly or in combination, have resulted in a civil conspiracy by and among the Defendants, have caused or will cause, among other consequences, the prevention and restraint of Dr. Poliner from competing in the field of interventional cardiology, with the following consequences:

    a.      Dr. Poliner has been restrained in his ability to make his services readily and fully available to the public;

    b.      patients of Dr. Poliner have been forced to seek the services of other physicians and will thus be denied specialized medical treatment;

    c.      Dr. Poliner, by the unlawful acts of Defendants, has been virtually eliminated from the in-patient healthcare services and treatment market at the Hospital by referrals and emergency room admissions, by the competitors in that market;

    d.      Dr. Poliner continues to be defamed and libeled in his practice of medicine and services by Defendants;

**ORIGINAL COMPLAINT** - **Page 36**

253456.6

e.      Defendants have depleted Dr. Poliner's resources who, even when granted his due process rights, privileges, and review requested, has expended the financial resources required to remain in business and to compete successfully in resisting or overcoming the Defendants' conspiracy;

f.      Defendants delayed the ultimate granting of rights, privileges, and review so as to severely damage Dr. Poliner's ability to compete or remain in business even though all or part of the rights, privileges, and review may ultimately be granted; and

g.      Defendants have deprived Dr. Poliner of a vested property right and his practice privileges at the Hospital.

102.    Defendants, singularly and/or in combination, have by their actions, violated the provisions of § 15.05 of the Texas Business and Commerce Code, by attempting to monopolize the practice of cardiology at the Hospital and/or unlawfully inhibit competition.  In general, and at the Hospital campus in particular, Defendants have, through a scheme, artifice or device, attempted to accumulate the cardiology  resources available to the public at the Hospital, into two cardiology groups, CIMA and North Texas Heart Center through which Defendants can regulate, exclude, and monopolize the practice of cardiology.  Dr. Poliner seeks both equitable relief and for damages for violations of § 15.05, Texas Business and Commerce Code, and pursuant to § 15.21, Texas Business and Commerce Code.  Dr. Poliner further alleges that the acts, statements, determinations and recommendations made, and facts reported by Defendants as more fully set forth above, were made with malice and without privilege, legal justification or excuse.

# VI.

## COUNT 3

## BREACH OF CONTRACT

### (Presbyterian Hospital)

103.    The statements and allegations contained in paragraphs 1-102 are incorporated by reference as though fully set out herein.

104.    The governing bylaws of the Hospital are the Amended Bylaws of Texas Health System (the "Hospital Bylaws"). The Hospital Bylaws provide that the Board of Trustees of THS has the legal responsibility for the quality of medical care rendered to patients in the health care facilities of THS, including the Hospital. The Hospital Bylaws provide for Medical/Dental staffs at each of its health care facilities, and delegate to the Medical/Dental staffs the authority and responsibility for establishing and maintaining reasonable standards of practice. The Hospital Bylaws further grant to the Medical/Dental staffs the authority to adopt their own Bylaws, rules and regulations, subject to approval by the Board of Governors of the applicable health care facility, including the Hospital.

105.    As part of the consideration for the use of the Hospital's facilities, the medical staff has recognized in its Bylaws its obligation to insure quality medical care, to supervise enforcement of the Hospital's rules and regulations, and to insure that each member of the medical staff observes all ethical principles of the profession. In connection with the Hospital's requirements that the medical staff be responsible for the quality of medical care at the Hospital, the medical staff has agreed in its Bylaws to investigate and evaluate credentials of applicants for staff privileges.

106.    The Medical Staff Bylaws provide a procedure for monitoring and correcting the performance of the medical staff.  Whenever the professional conduct of a doctor on the medical staff and his use of clinical skills is considered to be lower than the standards or aims of the medical staff or is deemed to be disruptive to the operations of the Hospital, corrective action against the doctor may be requested by a member of the medical staff, by the chairman of any clinical department, by the chairman of any standing committee of the medical staff, by the President, the Executive Director, or by the Hospital's Board of Governors.

107.    The Hospital Bylaws and the Medical Staff Bylaws, taken together, afford contractual due process rights to members of the medical staff under Texas law.

108.    The Hospital's actions described above violated Dr. Poliner's contractual right to due process, in at least the following respects:

    a.    The Hospital conducted reviews of three cases of Dr. Poliner without advising him that such  reviews were being undertaken, and without providing him an opportunity to respond to such charges.  Thereafter, even though each of these cases was cleared, those cases were subsequently used as justification by Dr. Knochel for the summary suspension of Dr. Poliner's privileges.

    b.    The "concerns" about the medical care provided by Dr. Poliner (who is a highly skilled cardiologist whose quality of care had never  been called  into question prior to 1998) were raised by cardiologists who were in direct economic competition with Dr. Poliner.  Dr. Poliner's rapidly growing

practice had begun to draw patients away from the practices of these other cardiologists.

c.    Based on reports from competing cardiologists, Dr. Knochel placed Dr. Poliner's privileges in abeyance pending further investigation. Dr. Knochel misrepresented to Dr. Poliner that if he failed to agree to the suspension, his privileges would be immediately terminated. At this point, a fair and reasonable investigation (including, for example, obtaining opinions from unbiased outside reviewers) would have disclosed that there was no basis for the "concerns" being raised by Dr. Poliner's competitors.

d.    Instead, Dr. Knochel appointed an ad hoc committee, comprised entirely of Dr. Poliner's direct economic competitors, to investigate him. He did this without providing any of the important procedural rights that accompany the ad hoc committee procedure under the Medical Staff Bylaws. Moreover, instead of simply investigating the four cases that had been brought to his attention ("K", "B"," D" and "W"), Dr. Knochel permitted the members of the ad hoc committee to look at numerous other cases of Dr. Poliner, all in an effort to find some way to eliminate Dr. Poliner from the staff. They did so under the purported cloak of immunity, with the express or implied assurance that even their identities would be shielded from disclosure. This encouraged Dr. Poliner's competitors to identify as many "problems" in Dr. Poliner's quality of care as they possibly could, where their zeal carried to the point that they made negligent, reckless and intentional misstatements – which

would have actually harmed the patients, to help ensure the termination of Dr. Poliner's privileges at Presbyterian Hospital.

e.    Every member of the ad hoc committee who was a competitor of Dr. Poliner reached harshly critical conclusions about the level of medical care provided by Dr. Poliner. The one member of the ad hoc committee who was not a significant competitor concluded that Dr. Poliner's work met the standard of care in the community. Eventually, every unbiased reviewer was to reach the same conclusion. It was unreasonable – and a violation of the letter and spirit of the due process provisions in the Medical Staff Bylaws – for Dr. Knochel to appoint an ad hoc committee comprised entirely of Dr. Poliner's competitors, and to rely solely on their evaluations in deciding to summarily suspend Dr. Poliner's privileges.

109.    Even though Dr. Poliner's privileges were eventually restored, the summary suspension – which was imposed as a result of the breach of contractual due process described above – remains a part of Dr. Poliner's permanent record. The fact that it was ever imposed, and the fact that it remains on his record, has caused and will continue to cause substantial damage to Dr. Poliner's cardiology practice.

110.    The Hospital violated the Hospital bylaws by issuing a summary suspension of Dr. Poliner's privileges without prior notice and hearing and under circumstances that were not appropriate for summary suspension, illegally boycotted the Plaintiff, and attempted to unfairly monopolize the cardiology practice at the Hospital. In addition, the Hospital failed to provide Dr. Poliner the opportunity to interview the ad hoc investigating committee, as required by the bylaws.

**ORIGINAL COMPLAINT** - Page 41

253456.6

111. The Hospital utilized the summary suspension method, despite the fact that the bylaws require its use only when a doctor presents an immediate danger to the healthcare of his patients - such as an impaired doctor. Further, the Hospital utilized economic competitors in violation of its own bylaws as well as the QHC Act.

112. As a result, Dr. Poliner seeks to recover his actual damages as proven at trial, together with his reasonable and necessary attorneys' fees, court costs, and interest as allowed by law.

## VII.

## COUNT 4

## VIOLATION OF FEDERAL HEALTH CARE QUALITY IMPROVEMENT ACT

## (All Defendants)

113. The statements and allegations contained in paragraphs 1-112 are incorporated by reference as though fully set out herein.

114. The Health Care Quality Improvement Act ("HCQ Act"), which was designed to encourage physicians to engage in reviews of their peers, permits immunity to attach to such review activities provided the reviews meet certain procedural requirements. In order to be entitled to a presumptive immunity under the HCQ Act, Defendants must meet the four requirements of the Act including the requirement that (1) the review action was taken in the reasonable belief that the action was in the furtherance of quality health care, (2) after reasonable effort to obtain facts of the matter, (3) after adequate notice and hearing procedures were afforded to the physician or after such other procedures as were fair to the physician under the circumstances and (4) in the reasonable belief that

the action was warranted by facts known after such reasonable effort to obtain facts and after such adequate procedures. 42 U.S.C. §11111(a)1, 11112(a).

115.    In the instant case, the Defendants forfeited their immunity under the HCQ Act because their actions were not taken in the reasonable belief that the action was in furtherance of quality health care but rather were taken to promote the goal of monopolizing invasive and interventional cardiology at the Hospital.    The reviews were conducted by reviewers who were economic competitors and they did not conduct an adequate investigation having failed to make a reasonable effort to obtain the true facts.  Moreover, no notice and hearing opportunity were provided to Dr. Poliner prior to the summary suspension, other than a one hour sham meeting in Dr. Knochel's office.

116.    That the Defendants acted in bad faith is also demonstrated by the fact that their reviews were based on arbitrary as opposed to authoritative standards of review and were riddled with misrepresentations, inaccuracies and misstatements.  The Defendants failed and refused to even interview Dr. Poliner before they administered the summary suspension of all cath lab and echocardiographic privileges (which comprised over 90% of his cardiology practice).    The Defendants failed to even consider his opinion.

117.    Amazingly, Dr. Knochel admitted during his peer review testimony that they failed to consider Dr. Poliner's opinion.  The Defendants acted out of a desire to monopolize or attempt to monopolize the invasive and interventional cardiology services within the relevant market, by eliminating Dr. Poliner and other competing cardiologists from the Hospital.  In addition to providing false reviews and relying upon incompetent reviewers, Defendants knowingly presented

false reports and false testimony.   These actions along with other actions demonstrate that the Defendants have forfeited their entitlement to any immunity under federal law.

118.   The various reviews conducted by the Defendants were so patently erroneous that it was not reasonable for the Hospital to rely on them as the basis for the summary suspension.

119.   In 1986, Texas adopted a mirror image of the Federal Health Care Quality Improvement Act, the Texas Health Care Quality Improvement Act, 4495b, § 5.06m, but added an additional component of malice.   In this case, the Defendants forfeited immunity because they acted with actual malice, i.e. - actual knowledge of the falsity or in reckless disregard of the falsity of the allegations against Dr. Poliner.   Defendants' malice is documented in at least the following ways:

a.      In summarily suspending the Plaintiff's privileges at the Hospital without a reasonable effort to obtain the facts, without prior notice and hearing in violation of the bylaws of the Hospital;

b.      In conducting a limited and biased false review by economic competitors, many of whom were not qualified to perform the reviews, who should not have been allowed to perform the reviews;

c.      In including in the case against Dr. Poliner seven (7) cases already reviewed and cleared by the risk committee that were used as the basis of the action against Dr. Poliner;

d.      In acting not in the interest of the furtherance of health care but out of a desire to monopolize or attempt to monopolize the invasive and interventional cardiology services at the Hospital;

**ORIGINAL COMPLAINT** - **Page 44**

253456.6

      e.      In intentionally and knowingly providing false and inaccurate summaries of Dr. Poliner's cases prepared by reviewers who were economic competitors;

      f.      In failing to utilize an objective outside reviewer for the purpose of conducting the reviews, especially after the IMAC expressly recognized the need for such an independent review; and

      g.      In presenting false testimony to the peer review panel.

120.    As a result of the foregoing, Dr. Poliner seeks a declaration that the Defendants are not entitled to immunity under federal or state law.

## VII.

## COUNT 5

## BUSINESS DISPARAGEMENT, SLANDER AND LIBEL

## (All Defendants)

121.    The statements and allegations contained in paragraphs 1-120 are incorporated by reference as though fully set out herein.

122.    The suspension of Dr. Poliner through the action of Defendants as set forth above, has been communicated by the Defendants to other physicians, hospitals, patients and individuals. Despite the intent of the Bylaws and the law that peer review proceedings be held in a confidential manner, Defendants allowed the information regarding Dr. Poliner's peer review to be published to various members of the Hospital's medical staff immediately (including specifically Dr. Poliner's referral doctors), such that Dr. Poliner was labeled a "dangerous doctor" well in advance of a hearing.

123.    The Defendants communications were slanderous and libelous per se because they had a tendency to injure Dr. Poliner in his profession and as such qualify as slander or libel per se in accordance with the statutory definitions contained in § 73.001 Texas Civil Practice & Remedies Code.

124.    The above-described defamation of Dr. Poliner by Defendants has held and continues to hold Dr. Poliner up to shame, contempt and ridicule and caused both personal and professional embarrassment and humiliation to him.  Dr. Poliner has suffered and will continue to suffer actual damage, including damages for lost profits, loss of past and future earning capacity in the amount in excess of  $1,000,000.  In addition, Dr. Poliner has suffered damages for past and future mental anguish and emotional distress all to his damage and detriment in an amount of at least $1,000,000.

125.    The avowed grounds upon which Dr. Poliner was suspended are entirely false and untrue.  The actions of Defendants as described herein are without privilege, legal justification or excuse.   Defendants' communications regarding Dr. Poliner's groundless suspension to other physicians, hospitals, patients, associations, media and individuals were spoken or written maliciously by the Defendants for the reason that they were made with the knowledge that they were false or with reckless disregard for whether they were true or false so as to indicate a conscious indifference to the rights of Dr. Poliner.  The acts, statements, determinations and recommendations made, and the acts reported by the Defendants as more fully set forth above, were made with malice. Accordingly, Dr. Poliner is entitled to recover exemplary damages in an amount up to two  times his economic damages, plus an amount equal to any non-economic damages, not to exceed $750,000.

## IX.

## COUNT 6

## TORTUOUS INTERFERENCE WITH BUSINESS

## (All Defendants)

126. The statements and allegations contained in paragraphs 1-125 are incorporated by reference as though fully set out herein.

127. The temporary abeyance and summary suspension and later termination of Dr. Poliner through the actions of the Defendants and the publication of the suspension and termination, as described herein, constitutes a tortuous interference with Dr. Poliner's business, particularly his relationship with his patients.

128. The suspension and termination of Dr. Poliner, and the publications of such fact to members of the medical staff, protected no legitimate business interest of the Defendants.

129. The suspension and termination, and the publications, improperly influenced other hospitals, physicians, patients, and other healthcare organizations not to deal with Dr. Poliner.

130. The acts, statements, determinations, and recommendations made and acts reported by the Defendants as described herein, were undertaken with malice and with the intention of preventing the contractual relationships between Dr. Poliner and his patients, as well as the contractual relationships with his referring doctors, from occurring. These actions were undertaken for the purpose of harming Dr. Poliner and inhibiting competition. Defendants did not and do not possess a privilege, legal justification or excuse which would have condoned such actions. Dr.

Poliner's business would not have been lost and Dr. Poliner would have obtained substantially greater business, in the absence of Defendants' interference.

131.    As a direct result of Defendants' interference with Dr. Poliner's business, Dr. Poliner has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in an amount in excess of $1,000,000 dollars. In addition, Dr. Poliner has suffered damages for past and future mental anguish and emotional distress, all to his damage and detriment in the amount of at least $1,000,000 dollars. Further, for the reasons more fully set forth above, Dr. Poliner is entitled to recover exemplary damages in an amount up to two times his economic damages, plus an amount equal to any non-economic damages up to $750,000.

## X.

## COUNT 7

## TORTUOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE

## (All Defendants)

132.    The statements and allegations contained in paragraphs 1-131 are incorporated by reference as though fully set out herein.

133.    The suspension of Dr. Poliner through the actions of the Defendants has resulted in a denial of the prospective business advantage which Dr. Poliner would have had in the Dallas/Fort Worth geographical market area, in that he has been denied the reasonable probability that he would have attracted patients for whom he would have performed medical services in the field of

interventional cardiology in the absence of Defendants' interference, as well as referrals from other doctors.

134.    By their acts, the Defendants have acted maliciously and intentionally and excluded Dr. Poliner from performing cardiology services at the Hospital thereby intentionally preventing him from forming relationships with new patients and with the intended purpose of denying Dr. Poliner the opportunity to perform the professional services for which he has been trained in the field of interventional cardiology in the Dallas/Fort Worth geographical area.

135.    The actions of the Defendants were not privileged, legally justified or excused.

136.    The actions of the Defendants have caused actual harm and damaged Dr. Poliner as a result of their depriving him of the vested property right to perform his professional skills at Presbyterian Hospital in the fields of interventional, echo and nuclear cardiology.

137.    As a direct result of Defendants' interference with Dr. Poliner's prospective advantage, Dr. Poliner has suffered and will continue to suffer actual damages including damages for loss profits, loss of past and future earning capacity in the amount in excess of $1,000,000. In addition, Dr. Poliner has suffered damages for past and future mental anguish and emotional distress all to his damage and detriment in the amount of at least $1,000,000. Further, the acts, statements, determinations and recommendations made and the acts reported by Defendants as more fully set forth above were made with malice. Dr. Poliner is entitled to recover exemplary damages in an amount up to two times Dr. Poliner's economic damages, plus an amount equal to any non-economic damages up to $750,000.

## XI.

## COUNT 8

## VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT

## (Presbyterian Hospital)

138.    The statements and allegations contained in Paragraphs 1-137 hereof are incorporated by reference as though fully set forth herein.

139.    At all times relevant to this suit, Defendants were engaged in "trade" and "commerce" as defined in Section 17.45(5) of the Deceptive Trade Practices-Consumer Protection Act, in Texas.

140.    The foregoing involves Defendants' use or employment of the following false, misleading or deceptive acts or practices that are specifically enumerated in the Deceptive Trade Practices-Consumer Protection Act, Section 17.46(b):

        a.      disparaging the goods, services, or business of another by false or misleading representation of facts;

        b.      representing that an agreement confers or involves rights, remedies, or obligations to which it does not have or involve, or which are prohibited by laws;

        c.      the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

141.    Accordingly, Dr. Poliner maintains his action under the Deceptive Trade Practices-Consumer Protection Act § 17.50 and under § 17.50(b) may recover his actual damages in an amount in excess of $1,000,000, and up to three times the amount of his actual damages for Defendants' acts that were committed knowingly.

## XII.

## COUNT 9

## INTENTIONAL INFLICTION OF MENTAL ANGUISH AND EMOTIONAL DISTRESS

### (All Defendants)

142.    The statements and allegations contained in paragraphs 1-141 are incorporated by reference as though fully set out herein.

143.    The summary suspension and termination of Dr. Poliner through the actions of the Hospital, Defendants and the publication of said suspensions as set forth above constitute intentional infliction of mental and emotional distress.

144.    By their acts these Defendants have acted intentionally and recklessly and excluded Dr. Poliner from performing cardiology services at the Hospital with the intended purpose of denying Dr. Poliner the opportunity to perform the professional services for which he has been trained.

145.    The actions of the Defendants were not privileged, legally justified or excused.

146.    The actions of the Defendants were extreme and outrageous and have caused actual harm and damage to Dr. Poliner as a result of their actions denying Dr. Poliner the right to perform his specialities to the fullest extent at the Hospital.

147.    As a direct result of Defendants' actions, Dr. Poliner has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in the amount of at least $1,000,000.  In addition, Dr. Poliner has suffered damages for past and future mental anguish and emotional distress all to his damage and detriment in the amount of at least $1,000,000.  Further, the acts, statements, determinations and recommendations made and acts reported by Defendants as more fully set forth above, were made with malice.  Dr. Poliner is entitled to recover exemplary damages in an amount up to two times his economic damages; plus an amount equal to any non-economic damages up to $750,000.

## XIV.

## COUNT 10

## APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

### (Presbyterian Hospital)

148.    The statements and allegations contained in paragraphs 1-147 are incorporated by reference as though fully set out herein.

149.    The Health Care Quality Improvement Act provides that a healthcare entity that "takes a professional review action that adversely affects the clinical privileges of a physician for a period of longer than 30 days" shall report to the Board of Medical Examiners information concerning the action taken against the physician 42 U.S.C. § 11133.  Texas has "opted- in" the federal enforcement scheme established by the Health Care Quality Improvement Act and incorporated the provisions of the Health Care Quality Improvement Act into its requirements. Texas Revised Civil Statutes Article 4495b, Section 5.06(a). Dr. Poliner will suffer immediate, irreparable

and permanent harm if Defendants are not restrained from enforcing or taking any professional review action which adversely affects Dr. Poliner's privileges at the Hospital in the future.  There is no adequate alternative remedy available to Dr. Poliner at this time.  Further, there is no danger that the public will be deprived of valuable services or benefits or otherwise suffer any injury if an injunction is issued.  Based upon the foregoing facts and lack of adequate remedy at law and due to the irreparable harm and damage which Dr. Poliner will suffer, it is respectfully requested that the Court issue an injunction restraining Defendants and their employees, officers, directors, representatives and/or agents from further enforcing or taking any professional review action which adversely affects Dr. Poliner's privileges at Presbyterian Hospital other than that action previously taken.

## XV.

## COUNT 11

## REQUEST FOR DECLARATORY RELIEF

### (All Defendants)

150.    The statements and allegations contained in paragraphs 1-149 are incorporated by reference as though fully set out herein.

151.    Pursuant to § 37.001 of the Texas Civil Practice and Remedies Code and Section 4 of the Clayton Act, 15 U.S.C. §26, Dr. Poliner requests that the Court declare that Defendants' actions are not entitled to immunity under either the HCQ Act, 42 U.S.C.A. § 11111, *et. seq.,* or the state version, Art.  4495b § 5.06(m), V.T.C.S.

152.    As a direct and proximate result of the actions of Defendants, Dr. Poliner has expended considerable sums of money which Dr. Poliner would not otherwise had been required to

spend due to the necessity of overcoming the attempts of the Defendants to deny Dr. Poliner's cardiology practice at the Hospital.

153.    As a direct result of the foresaid actions of Defendants, Dr. Poliner's echo and cath lab privileges at the Hospital were terminated, and Dr. Poliner will continue to suffer substantial damages to his reputation and practice, all to his detriment.

154.    Dr. Poliner has incurred and will continue incur a loss of revenues including loss of patients and loss of proceeds from the sale of medical services that Dr. Poliner could reasonably anticipate if his practice of medicine had not been illegally restrained.

155.    Dr. Poliner has incurred significant direct cost as a result of the actions of Defendants alleged herein.

156.    Dr. Poliner is unable at this time to state finally the amount of damages sustained and to be sustained by reason of the illegal acts of the Defendants set forth herein. Dr. Poliner would show that, but for the actions of Defendants, Dr. Poliner has suffered and will continue to suffer damages in the amount of at least $1,000,000. Dr. Poliner is further entitled to all damages as permitted by law including without limitation, declaratory relief, simple interest on actual damages, interest as allowed by law, cost of suit and attorney's fees, all pursuant to applicable law including, without limitation, Sec. 38.001, Texas Civil Practice & Remedies Code and Sec. 37.009 of the Texas Civil Practice & Remedies Code. In this regard, Dr. Poliner would show that he was required to bring this suit and has agreed to pay reasonable attorney's fees for trial or hearing in this cause in this court and additional reasonable amount in the event an appeal is taken to the court of appeals; an additional reasonable amount in the event Dr. Poliner is required to respond to an application for writ of error and additional reasonable amount for an appeal to the Supreme Court of the United States.

# XVI.

## COUNT 12

## DENIAL OF DUE PROCESS

### (Presbyterian Hospital)

157.    The statements and allegations contained in paragraphs 1-156 are incorporated by reference as though fully set out herein.

158.    Dr. Poliner held a property interest in his contractual relationship with the Hospital for privileges, together with his contractual right to treat his patients and be paid by his patients and their insurance companies.   These property rights are subject to protection under the due process clause of the Texas Constitution as well as the 14th Amendment of the United States Constitution.

159.    Accordingly, in the absence of exigent circumstances, these rights could not be taken away without affording due process.

160.    Further, under the Texas Hospital Licensing Law, all hospitals that are licensed must provide procedural due process.   Texas Health & Safety Code § 241.101.   Under Texas law, the process for considering applications for medical staff membership and privileges or the renewal, modification, or revocation of medical staff privileges must afford each physician procedural due process.

161.    Defendants summary suspension of Dr. Poliner denied Dr. Poliner his due process right and caused him substantial damages.   There was no prior notice to Dr. Poliner that his privileges were about to be suspended.   Dr. Poliner was given less than one hour to discuss all 26 cases under review with the IMAC.   The members of IMAC were completely disinterested in

anything Dr. Poliner had to say. The members of IMAC were simply a "rubber stamp" of the findings of the competing cardiologists and of Dr. Knochel. There was no hearing. There were no witnesses presented. There was no opportunity for cross examination. There were no exhibits reviewed.

162.    The fact that after the fact, Dr. Poliner was given an opportunity to have a review hearing does not change the fact that procedural due process was not followed. Once Dr. Poliner was summarily suspended, he was "in the system" and he was labeled a dangerous doctor. Accordingly, the post-facto opportunity to have a hearing does not satisfy the Hospital's due process obligations.

163.    As a direct result of Defendants interference with Dr. Poliner's business, Dr. Poliner has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in the amount in excess of $1,000,000 dollars. In addition, Dr. Poliner has suffered damages for past and future mental anguish and emotional distress, all to his damage and detriment in the amount of at least $1,000,000 dollars. Further, for the reasons more fully set forth above, Dr. Poliner is entitled to recover exemplary damages in an amount up to two times his economic damages, plus an amount equal to any non-economic damages up to $750,000.

**XVII.**

**COUNT 14**

**VIOLATION OF THE TEXAS MEDICAL PRACTICE ACT**

**(All Defendants)**

164.    The statements and allegations contained in paragraphs 1-163 are incorporated herein by reference as if set forth at length.

165.    The actions and conduct of Defendants described herein, in commencing and continuing a peer review investigation of Dr. Poliner, were taken with malice as defined under Texas law, and without a reasonable basis.  Accordingly, Dr. Poliner is entitled to recover his actual damages incurred as a result of such violation.

166.    Accordingly, Dr. Poliner sues to recover his actual damages as proven at trial, together with his reasonable and necessary attorneys fees, interest and court costs as allowed by law.

**WHEREFORE, PREMISES CONSIDERED**, Dr. Poliner prays that Defendants be cited to appear and answer herein, and that upon final trial or hearing, Dr. Poliner recover judgment against the Defendants, jointly and severally, ordering as follows:

A.    That the Court adjudge and decree that Defendants have engaged in an unlawful attempt to monopolize and to conspire to monopolize the cardiology market and to inhibit competition, in violation of federal law;

B.    That the Court adjudge and decree that Defendants have engaged in an unlawful conspiracy to attempt to monopolize the cardiology market and conspiracy to inhibit competition, in violation of Texas law;

C.    That the Court award Dr. Poliner his actual damages as proved at trial on all Counts of the Complaint;

D.    That the Court award Dr. Poliner statutory damages as allowed by law;

E.    That each of the Defendants and the respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, or in concert therewith be perpetually enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid conspiracy, and from

**ORIGINAL COMPLAINT** - **Page 57**

adopting or following any practice, plan, program or design, having a similar purpose or effect;

F.  That the Court grant an injunction against the Defendants from enforcing or taking any professional review action which adversely affects Dr. Poliner's privileges at the Hospital without justification;

G.  That the Court award punitive damages as allowed by law;

H.  That the Court award pre-judgment and post-judgment interest as provided by law;

I.  That Dr. Poliner be awarded reasonable and necessary attorneys' fees in the trial court and all subsequent appeals;

J.  That the Court award Dr. Poliner his taxable costs of Court; and

K.  That this Court grants such other and further relief to which Dr. Poliner may show himself justly entitled.

Respectfully submitted,

**KANE, RUSSELL, COLEMAN & LOGAN, P.C.**

By: _____

Michael A. Logan
State Bar No. 12497500
Jeffrey S. Seeburger
State Bar No. 00788381
Karin M. Zaner
State Bar No. 00791183
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
(214) 777-4294
(214) 777-4299 (Telecopier)

**ATTORNEYS FOR PLAINTIFF**