IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LAWRENCE R. POLINER, M.D. and          §
LAWRENCE R. POLINER, M.D., P.A.,       §
                                       §
        Plaintiffs,                    §
                                       §
v.                                     §
                                       §          CIVIL ACTION NO.
TEXAS HEALTH SYSTEMS, a Texas          §          3:00-CV-1007-P
non-profit corporation, d/b/a PRESBYTERIAN §
HOSPITAL OF DALLAS, and JAMES          §
KNOCHEL, M.D.,                         §
                                       §
        Defendants.                    §

## MEMORANDUM OPINION AND ORDER

Now before the Court are five post-trial motions: (1) Plaintiffs' Motion for Judgment, filed September 16, 2005; (2) Defendants' Renewed Motion for Judgment as a Matter of Law, filed October 3, 2005; (3) Defendant's Request for Oral Argument, filed September 16, 2005; (4) Defendants' Motion for a New Trial, filed September 16, 2005; and (5) Plaintiffs' Post-Trial Petition for Attorneys' Fees, Expenses, and Costs, filed August 23, 2005.

After careful consideration of the Parties' briefing, the evidence, and the applicable law, the Court hereby GRANTS Plaintiffs' Motion for Judgment; DENIES Defendants' Renewed Motion for Judgment; DENIES as MOOT Defendant's Request for Oral Argument, DENIES in PART Defendants' Motion for a New Trial; and DENIES as MOOT Plaintiffs' Post-Trial Petition for Attorneys' Fees, Expenses, and Costs.  The Court will resolve Defendants' Motion for Entry of a Take-Nothing Judgment on Claims that Were the Subject of Summary Judgment in a subsequent order.

1

## **BACKGROUND**

This case arose out of Dr. Lawrence R. Poliner's ("Dr. Poliner") and Lawrence R. Poliner, M.D., P.A.'s (the "Professional Association") (collectively, "Plaintiffs") claims that Defendants Dr. James Knochel, Dr. Charles Levin, Dr. John Harper and Presbyterian Hospital of Dallas (the "Hospital") (collectively, "Defendants") improperly and maliciously used the peer-review process to summarily suspend Dr. Poliner's privileges, thereby causing damage to his interventional cardiology practice. An overview of the relevant facts of this case has been set forth in the Court's summary judgment order of September 30, 2003 and can be found at *Poliner v. Tex. Health Sys. et al.*, Civ. Action No. 3:00-CV-1007-P, 2003 WL 22255677 (N.D. Tex. Sept. 30, 2003).

Plaintiffs filed this lawsuit in May 2000 against the Hospital, Drs. Knochel, Levin, and Harper, and other cardiologists on various Hospital peer-review committees for damages arising out of an alleged unlawful peer review process. Plaintiffs included claims for antitrust violations under federal and state law, breach of contract, defamation, business disparagement, tortious interference with a contract, violation of the DTPA, and intentional infliction of emotional distress. Plaintiffs also moved for a declaratory judgment that Defendants' actions were not entitled to peer-review immunity under the federal Health Care Quality Improvement Act or the Texas Occupations Code.

In September 2003, the Court granted in part and denied in part Defendants' motion for summary judgment on all of Plaintiffs' claims. The Court granted summary judgment for all defendants on Plaintiffs' DTPA and antitrust claims. The Court granted summary judgment for the other cardiologists on the various peer-review committees on all claims, finding them entitled to peer review immunity under the state and federal statutes. The Court also determined that fact issues existed as to whether Defendants acted with actual malice with respect to the May 14, 1998 peer-review action, and permitted the remaining claims against them to be tried to a jury. (*See* Court's

2

Order of Sept. 30, 2003; *Poliner,* 2003 WL 22255677.)  In a subsequent order, the Court articulated

that Plaintiffs were precluded from seeking damages resulting from the June 12, 1998 suspension

imposed on Dr. Poliner.  (*See* Court's Order of July 7, 2004; *Poliner,* Civ. Action No. 3:00-CV-

1007-P, 2004 WL 1542164, at *3 (N.D. Tex. July 7, 2004).)

Trial of this case commenced on August 12, 2004 against Defendants and an eight-person

jury returned a unanimous verdict against all Defendants on August 27, 2004.  The jury first found

that Defendants' actions were not immune from civil liability under the federal or state peer review

statutes.  The jury also found in favor of Plaintiffs on all of their claims, including breach of

contract, defamation, business disparagement, tortious interference with a contract, and intentional

infliction of emotional distress.  The jury further found that Defendants had acted maliciously and

without justification or privilege.  The jury awarded compensatory and exemplary damages against

Defendants in the total amount of $366,211,159.30.  Dr. Poliner has since settled with Drs. Levin

and Harper, both of whom have been dismissed from this lawsuit.

After receiving the jury's verdict, the Court established a post-trial briefing schedule and

ordered the Parties to participate in mediation.  The Parties mediated on June 1, 2005 before the

Honorable David Keltner, but were unable to reach a settlement.  Judge Keltner declared an impasse

on August 17, 2005 and officially closed the mediation.

Plaintiffs now move for entry of judgment on the jury's verdict.  Plaintiffs elect to recover

the actual damages for injury to career/reputation and mental anguish that the jury found were

proximately caused by Defendants' defamatory statements, as set forth in Jury Question No. 11.

They also seek to recover for loss of earnings against the Hospital for breach of contract, plus

reasonable and necessary attorneys' fees.  Additionally, Plaintiffs seek to recover the full amount

of exemplary damages awarded by they jury against Dr. Knochel and the Hospital in Jury Question

3

No. 21.  Finally, Dr. Poliner seeks recovery of prejudgment and postjudgment interest, as well as costs.

Meanwhile, Defendants have renewed their motion for judgment as a matter of law, asking the Court to enter judgment in Defendants' favor on all Plaintiffs' claims.

## DISCUSSION

### I. WAIVER.

Before reaching the merits of this case, the Court must address a procedural issue.  Plaintiffs contend that many of Defendants' grounds for judgment in their favor, as presented in Defendants' renewed motion for judgment, are waived because they were not raised in Defendants' original motion for judgment as a matter of law.  (Pls.' Resp. at 2-5.)

A renewed motion for judgment as a matter of law under Rule 50(b),[1] like the motion for judgment as a matter of law under Rule 50(a),[2] must state the grounds on which it is made.  Since the Rule 50(b) motion, which is made after submission of the case to the jury, is nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence, it cannot assert a ground that was not included in the earlier motion.  *See Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1010 (5th Cir. 1998); *Allied Bank-West, N.A. v. Stein*, 996 F.2d 111, 115 (5th Cir. 1993); C. Wright and A. Miller, 9A Federal Practice and Procedure § 2537 (2d ed. 1994).  The purpose of the rule is to ensure that the court and the plaintiff are alerted to the grounds on which the defendant contends the evidence is insufficient prior to the submission of the case to the jury.  *See Greenwood v. Societe Francaise De,* 111 F.3d 1239, 1245 (5th Cir. 1997).  In other words, the rule is intended

---

[1]  Formerly known as a motion for judgment notwithstanding with verdict.  *See Armstrong v. City of Dallas,* 997 F.2d 62, 66 n.9 (5th Cir. 1993).

[2]  Formerly known as a motion for directed verdict.  *See Armstrong,* 997 F.2d at 66 n.9.

to prevent a party from raising a new argument after the jury has reached a verdict. *See Charbonnet v. Lee*, 951 F.2d 638, 642 n.20 (5th Cir. 1992).

While a renewed motion for judgment as a matter of law may not enlarge or assert new matters not presented in the motion for judgment, "technical precision is not necessary in stating the grounds for the motion [for judgment as a matter of law] so long as the trial court is aware of the movant's position." *See Dimmitt Agri Indus., Inc. v. CPC Intern. Inc.*, 679 F.2d 516, 521 (5th Cir. 1982). This circuit has excused a defendant's technical noncompliance caused by a failure to move for judgment under Rule 50(a) where the purpose of the rule has been satisfied. *See Villanueva v. McInnis*, 723 F.2d 414, 416-17 (5th Cir. 1984). For instance, courts will allow an objection or combination of objections to the charge to serve as the functional equivalent of a formal Rule 50(a) motion as long as the court and the plaintiff had notice of the grounds on which the defendant contended the evidence was insufficient before the case was submitted to the jury. *See Greenwood*, 111 F.3d at 1245 n.4.

Plaintiffs identify twenty-six specific arguments made by Defendants in their renewed motion that Plaintiffs contend were not raised in the original motion for judgment as a matter of law and are therefore waived. (Pls.' Resp. at 3-5.) In response, Defendants make a general argument that the issues raised in their renewed motion are sufficiently similar to those raised in the motion for directed verdict, and therefore have not been waived.

Defendants do respond specifically to two of Plaintiffs' waiver arguments. First, they contend that their defenses of consent (*i.e.* agreement) and estoppel relating to Dr. Poliner's signing of the abeyance were not waived because they were extensively discussed at the charge conference, which serves as the functional equivalent of a formal motion addressing these issues. (Defs.' Reply

5

at 3.) Defendants refer to an exchange at the charge conference during which counsel and the Court discussed in detail the effect of a jury finding that Dr. Poliner agreed to the abeyance. (*See* Defs.' Reply App. at 413-23.)  In that exchange, the Court and counsel discussed whether Dr. Poliner's claims against Defendants should be barred if Dr. Poliner was found to have voluntarily agreed to the abeyance. (*Id.*)  The Court and counsel agreed that the effect of such a finding would be dealt with post-verdict. (*Id.* at 418-20.)  Because the Court and counsel were adequately informed of these issues, the Court concludes that it is not precluded from reexamining the defenses of consent and estoppel with respect to the abeyance, and a judgment in Defendants' favor may be entered thereon.

Second, Defendants contend that their argument that Plaintiffs failed to segregate the damages caused exclusively by the abeyance was not waived because Defendants and the Court have repeatedly emphasized that Plaintiffs must present sufficient evidence of damages incurred during the abeyance period.  Defendants note that the need for Plaintiffs to segregate their damages was raised in the Court's July 7, 2004 Order, at the pretrial conference, during the charge conference, and again during trial. Because the Court and counsel were adequately informed of this issue, the Court concludes that it is not precluded from reexamining the issue of whether there was sufficient evidence that damages arose solely from the abeyance, and judgment in Defendants' favor may be entered thereon.

With respect to the remaining twenty-four issues raised by Plaintiffs, Defendants are required to either identify those portions of their Rule 50(a) motion that encompass the issues raised in their renewed motion or identify the objections made that serve as the functional equivalent of a formal motion.  Defendants' general and conclusory statement that their Rule 50(b) arguments are

6

"nuances, shades, or phases" of arguments raised in their motion for directed verdict does not satisfy this requirement. (Defs.' Reply at 3.) Therefore, the remaining issues are hereby WAIVED and will not be considered by the Court for judgment as a matter of law.

## II.  IMMUNITY.

The jury found in Jury Questions Nos. 3 and 4 that Defendants were not entitled to the immunity afforded to peer review participants under the federal and state peer review statutes. Defendants challenge those findings on several bases.

### A.  Federal Peer Review Immunity.

#### 1.  Abeyance is Immune as a Professional Review Activity.

Defendants argue that the abeyance and the subsequent extension are not professional review actions, but instead are professional review activities that are not subject to the strictures of 42 U.S.C. § 11112(a).  (Defs.' Mot. at 10.)  Because this argument was not raised in the previous motion for judgment as a matter of law, this issue has been waived.

#### 2.  No Evidence That Abeyance Did Not Meet HCQIA Requirements.

Defendants also contend there was no evidence to support the jury's findings that Defendants were not entitled to HCQIA immunity. (Defs.' Mot. at 16.)[3]  First, Defendants challenge the jury's finding that Defendants' suspension of Dr. Poliner's cardiac catheritization lab privileges was not undertaken in the reasonable belief that the action furthered quality health care  (Defs.' Mot. at 13;

---

[3]  Defendants have employed an exhausting and questionable post-trial briefing strategy whereby they make no-evidence arguments for virtually every element of every claim presented to the jury.  Rather than spend their resources briefing what few credible arguments they may have had, Defendants chose to bombard the Court with dozens of untenable ones.  This has caused the Court to expend valuable resources researching, analyzing, and rejecting those non-viable positions.

Jury Question No. 3(1). ) Defendants also argue there was no evidence to support the jury's finding that the suspension was not undertaken after a reasonable effort to obtain the facts of the matter. (Defs.' Mot. at 14; Jury Question No. 3(2).) Defendants further contend there was no evidence to support the jury's finding that the suspension was not undertaken after adequate notice and hearing procedures were afforded Dr. Poliner. (Defs.' Mot. at 15; Jury Question No. 3(3).) Finally, Defendants argue there was no evidence to support the jury's finding that the suspension was not undertaken in the reasonable belief that the suspension was warranted by the facts known. (Defs.' Mot. at 15-16; Jury Question No. 3(4).)

At trial, the jury heard Dr. Knochel testify that he did not have enough information to assess whether Dr. Poliner posed a present danger to his patients at the time he asked Dr. Poliner to agree to the abeyance. (Pls.' App. at 74, 78.) He threatened Dr. Poliner with suspension of his privileges if Dr. Poliner refused to sign the abeyance letter, even though "[w]e didn't determine that [Dr. Poliner was a present threat to his patients at that particular point. That is why we asked for an abeyance to investigate it to see if he was in fact dangerous to his patients." (Pls.' App. at 74.) Dr. Knochel was prepared to suspend Dr. Poliner's privileges despite the fact that he did not know whether Dr. Poliner posed a present danger to his patients. Clearly, this evidence supports the jury's finding that the suspension was not undertaken in the reasonable belief that Dr. Poliner posed a present danger to the health of his patients. Additionally, Dr. Poliner's medical experts testified that no reasonable hospital could have taken the action it did against Dr. Poliner except by knowingly or recklessly disregarding the medical evidence. (Pls.' App. at 99, 106, 137, 203, 208A.) The jury also heard Dr. Knochel testify that he informed Dr. Poliner that Dr. Poliner must agree to an abeyance of his cath lab privileges or Dr. Knochel would terminate all his hospital privileges

8

immediately. (Pls.' App. at 74-77, 179.) Dr. Knochel did not offer Dr. Poliner any other options that may have been less severe. (Pls.' App. at 77.) There was also evidence that Dr. Knochel told Dr. Poliner that he was not permitted to consult an attorney. (Pls.' App. at 180.) Furthermore, there was evidence at trial that Defendants would not discuss the patient cases with Dr. Poliner prior to his summary suspension and did not provide Dr. Poliner with any opportunity to be heard or any hearing of any kind prior to his summary suspension. (Pls.' App. at 95, 107, 125, 210.)

Defendants' unwillingness to hear from Dr. Poliner with respect to his patients and his medical treatment of them could have reasonably led a jury to conclude that Defendants did not have a reasonable belief that the action furthered quality health care and that the suspension was not undertaken after a reasonable effort to obtain the facts of the matter. Likewise, Defendants' unwillingness to afford Dr. Poliner an opportunity to be heard or to consult with an attorney supports the jury's finding that the suspension was not undertaken after adequate notice and hearing procedures were afforded Dr. Poliner. Finally, Dr. Knochel's own testimony that he did not have enough information to determine whether Dr. Poliner posed an imminent danger at the time of the abeyance/summary suspension supports the jury's finding that the suspension was not undertaken in the reasonable belief that the suspension was warranted by the facts known. This evidence is sufficient to support the jury's findings in Jury Question No. 3 regarding the elements of HCQIA immunity.[4]

---

[4] 42 U.S.C. § 11112(c)(1)(B) states that notice and hearing are not required "in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action. . ." Defendants argue that this section obviated their need to provide Dr. Poliner with notice and a hearing before asking for the abeyance because the restriction of his privileges was not for a period longer than 14 days. (Defs.' Mot. at 15.) Even if this requirement is eliminated as one of the elements necessary for granting immunity, the jury found that of the remaining three elements, none were met, and therefore immunity could not be afforded.

**B.  State Peer Review Immunity.**

State law provides greater immunity than HCQIA by immunizing any participant in health care peer review who acts without malice and in the reasonable belief that the action or recommendation is warranted by the facts shown.  *See* Tex. Occ. Code Ann. § 160.010(a)(2). Defendants argue they are entitled to state peer review immunity as a matter of law because there was no evidence of malice.  (Defs.' Mot. at 18-21.)  However, the evidence supporting the jury's finding of malice under the Texas peer review statute is the same evidence used to defeat contractual and HCQIA immunities.

At trial, the jury heard Dr. Knochel testify that he did not have enough information to assess whether Dr. Poliner posed a present danger to his patients at the time he asked Dr. Poliner to agree to the abeyance.  (Pls.' App. at 74, 78.)  The Hospital president also testified that he did not know all of the facts surrounding the abeyance/summary suspension at the time.  (Pls.' App. at 56.)  Dr. Knochel threatened Dr. Poliner with suspension of his privileges if Dr. Poliner refused to sign the abeyance letter, even though "[w]e didn't determine that [Dr. Poliner was a present threat to his patients at that particular point.  That is why we asked for an abeyance to investigate it to see if he was in fact dangerous to his patients." (Pls.' App. at 74.)  Dr. Knochel was prepared to suspend Dr. Poliner's privileges despite the fact that he did not know whether Dr. Poliner posed a present danger to his patients.  Clearly, this evidence supports the jury's finding that the suspension was not undertaken in the reasonable belief that Dr. Poliner posed a present danger to the health of his patients.  The jury also heard Dr. Knochel testify that he informed Dr. Poliner that Dr. Poliner must agree to an abeyance of his cath lab privileges or Dr. Knochel would terminate all his hospital privileges immediately.  (Pls.' App. at 74-77, 179.)  Dr. Knochel did not offer Dr. Poliner any other

10

options that may have been less severe. (Pls.' App. at 77.) There was also evidence that Dr. Knochel told Dr. Poliner that he was not permitted to consult an attorney. (Pls.' App. at 180.) Additionally, Dr. Poliner's medical experts testified that no reasonable hospital could have taken the action it did against Dr. Poliner except by knowingly or recklessly disregarding the medical evidence. (Pls.' App. at 99, 106, 137, 203, 208A.) Furthermore, there was evidence at trial that none of the Defendants would discuss the patient cases with Dr. Poliner prior to his summary suspension and that they did not provide Dr. Poliner with an opportunity to be heard or any hearing of any kind prior to his summary suspension. (Pls.' App. at 95, 107, 125, 210.) This evidence is sufficient to support the jury's finding in Jury Question No. 4 that Defendants invoked the summary suspension with malice and not in the reasonable belief that the action was warranted by the facts known to them.

## III.  THE ONE-SATISFACTION RULE.

Another issue the Court must resolve before addressing the merits of Plaintiffs' claims is which of Plaintiffs' claims entitle Plaintiffs to recover damages. A party is generally entitled to sue and to seek damages on alternative theories. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex. 1998). A party is not, however, entitled to a double recovery, which exists when a plaintiff obtains more than one recovery for the same injury. *See Tompkins v. Cyr*, 202 F.3d 770, 785 (5th Cir. 2000). Under the one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991); *see also Bradshaw v. Baylor Univ.*, 84 S.W.2d 703, 705 (Tex. 1935). This rule applies when multiple defendants commit the same act as well as when defendants commit technically different acts that result in a

11

single injury.  *See Crown Life Ins. Co.*, 22 S.W.3d at 390.  Thus, notwithstanding an alternative

theory of liability, a double recovery will result if multiple damage awards are the result of one

injury.  *See Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987).  When the

prevailing party fails to elect between alternative measures of damages, the court should render the

judgment affording the greatest recovery.  *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex.

1995).

Defendants contend that Plaintiffs are entitled to one recovery because they suffered a

singular injury and because Defendants did not engage in separate, independent acts giving rise to

liability. (Defs.' Mot. at 41-42.)  Plaintiffs concede they are entitled to one satisfaction with respect

to their tort claims, but argue they are entitled to a separate recovery for their breach of contract

claim because it involves a separate wrong.  (Pls.' Resp. at 44.)  Plaintiffs explain that their breach

of contract claim is premised on the Hospital's failure to comply with the procedural safeguards

provided to Dr. Poliner under the Hospital/Medical Staff Bylaws, whereas the tort claims are

premised on Defendants' false representation and publication that Dr. Poliner was a dangerous

doctor.

In this case, Dr. Poliner asserted a breach of contract claim against the Hospital for failing

to comply with the safeguards provided in the Medical Staff and Hospital Bylaws in connection with

the summary suspension of May 14, 1998.  The Hospital Bylaws specifically incorporate the

Medical Staff Bylaws' provisions for withdrawing staff privileges with due process. (Pls.' App. at

396.)  The Medical Staff Bylaws effectively limit the powers of the Hospital by restricting the

Hospital's ability to invoke a summary suspension to those cases involving present danger.  (Defs.'

App. at 352.) Because the Medical Staff Bylaws limit the powers of the Hospital, the provision may

12

be enforced against the Hospital.  *See Stephan v. Baylor Med. Ctr.*, 20 S.W.3d 880, 888 (Tex. App. - Dallas 2000, no pet.).

The evidence established that Defendants breached the Medical Staff Bylaws by not having a reasonable belief that Dr. Poliner posed a present danger to the health of his patients and by failing to get Dr. Poliner's voluntary consent to the abeyance.  Defendants were also found liable for breaching the Hospital Bylaws by failing to provide Dr. Poliner with adequate notice and hearing procedures.

The jury also separately considered and found Defendants liable for defamation arising from the statement implicit in the suspension that Dr. Poliner posed a present danger to this health of his patients and for tortiously interfering with Plaintiffs' patient contracts.

However, the evidence at trial reflected a single injury for Plaintiffs' loss of earnings and a single injury for mental anguish and injury to career/reputation.  There was no evidence that the contract breach caused Dr. Poliner to suffer an injury to reputation/career or mental anguish separate and distinct from those caused by the tortious conduct.  Because the breach of contract and the tortious conduct resulted in the same injuries, only one recovery is permissible.  Additionally, because the acts of the multiple defendants resulted in the same injuries, only one recovery is allowed against Defendants.  Finally, because both Plaintiffs suffered the same injuries together, Plaintiffs are entitled to one recovery for both of their injuries.  Although the jury imposed different liability amounts for each of the different defendants and awarded different damage awards for each of the different causes of action, the evidence at trial indicated that Plaintiffs suffered one injury.  Consequently, Plaintiffs may recover only once for any proven damages that were suffered as a result of this singular injury.

## IV.  DR. POLINER'S BREACH OF CONTRACT CLAIM.

Dr. Poliner seeks entry of judgment on the jury's breach of contract award against the Hospital.  Although the jury found the Hospital liable in the amount of $30,000,000 (Jury Question No. 6.), Dr. Poliner seeks recovery in the amount of $10,526.55, the amount of direct economic damages caused by the breach of contract and allegedly sustained by Dr. Poliner during the abeyance period.  (Pls.' Mot. at 26-28.)

Defendants argue they are entitled to judgment as a matter of law on Dr. Poliner's breach of contract claim because (1) the Medical Staff Bylaws do not create a contract between the Hospital and Dr. Poliner; (2) the Jury Charge failed to submit breach of the Hospital Bylaws; (3) Dr. Poliner failed to establish the essential elements of his breach of contract claim; and (4) Dr. Poliner consented to the abeyance.

### A.  Existence of a Contract.

Defendants argue that the Court erred in finding at the summary judgment stage that a contract existed because the Hospital Bylaws were not limited or curtailed in any way by the Medical Staff Bylaws and because the Hospital Bylaws' reference to due process was indefinite and vague.  (Defs.' Mot. at 2, 4 n.2; Defs.' Reply at 7.)

The Hospital Bylaws specifically incorporate the Medical Staff Bylaws' provisions for withdrawing staff privileges with due process.  (Defs.' App. at 396.)  In turn, the Medical Staff Bylaws specifically provide, with respect to summary suspensions specifically, that Hospital representatives may summarily suspend the privileges of a physician only when the acts of the physician constitute a "present danger" to the health of his patients.  (Defs.' App. at 352.)  Thus, the Medical Staff Bylaws effectively limit the powers of the Hospital by restricting the Hospital's ability

14

to invoke a summary suspension to those cases involving present danger.  Because this Medical Staff Bylaws' provision does attempt to limit the powers of the Hospital, the provision may be enforced against the Hospital.  *See Stephan v. Baylor Med. Ctr.*, 20 S.W.3d 880, 888 (Tex. App. - Dallas 2000, no pet.) (citing *Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895, 897 (Tex. Civ. App.- Waco 1962, writ ref'd n.r.e.) (bylaws that do not attempt to limit the power of a hospital as it acts through its governing board do not create contractual obligations for the hospital).

The *Stephan* case relied on by Defendants is distinguishable from this case in several key respects.  First, Dr. Stephan was a physician applying for staff privileges at the hospital, whereas Dr. Poliner was a staff physician whose privileges were being taken away.  In *Stephan,* neither common law, statutory law, nor the applicable hospital or medical staff bylaws provided any standard for denying hospital privileges to a physician, whereas in this case, the Medical Staff Bylaws do provide a standard for invoking a summary suspension - that the physician must constitute a present danger to the health of his patients.  *See Stephan,* 20 S.W.3d at 886.  Dr. Poliner, as well as all other physicians with staff privileges, had a reasonable expectation that they would not be summarily suspended unless found to be a present danger.  This expectation bolsters the argument for the existence of a contract.  Furthermore, unlike this case, the *Stephan* court found nothing in the medical staff bylaws that attempted to limit the hospital's power to act with respect to Dr. Stephan.

Additionally, the Hospital Bylaws' reference to due process is not so indefinite or vague as to render a contract unenforceable.  At a minimum, due process requires notice and an opportunity to be heard - neither of which was provided to Dr. Poliner at the summary suspension stage.

For these reasons, the Court rejects Defendants' arguments and affirms its earlier ruling that a contract existed between Dr. Poliner and the Hospital.

15

**B.  Lack of Consideration.**

Defendants also argue that the Medical Staff Bylaws are unenforceable because there was no consideration to support the agreement.  (Defs.' Mot. at 4.)  Because this argument was not raised in Defendants' original motion for judgment as a matter of law, the issue has been waived.

**C.  No Evidence of Breach.**

Plaintiffs alleged - and the jury found - that Defendants breached the Medical Staff Bylaws, and hence the Hospital Bylaws, in three ways.  First, the Medical Staff Bylaws allow the Hospital to hold a physician's hospital privileges in abeyance only if the physician agrees to the abeyance.  (Pls.' App. at 352.)  The jury concluded that Defendants breached this provision of the Medical Staff Bylaws because, it found, Dr. Poliner did not voluntarily agree to the abeyance.  (Jury Question No. 2.)  Defendants challenge this finding and contend that the evidence demonstrated that Dr. Poliner did in fact consent to the abeyance, that his consent to the abeyance was not caused by duress, and that the jury's verdict was without sufficient evidence.  (Defs.' Mot. at 5, 7.)

At trial, Dr. Knochel testified that he informed Dr. Poliner that Dr. Poliner must agree to an abeyance of his cath lab privileges or Dr. Knochel would terminate all of Dr. Poliner's hospital privileges immediately.  (Pls.' App. at 74-77, 179.)  Dr. Knochel did not offer Dr. Poliner any other options that may have been less severe.  (Pls.' App. at 77.)  There was evidence at trial that Dr. Knochel told Dr. Poliner that he was not permitted to consult an attorney.  (Pls.' App. at 180.)  This was sufficient evidence to cause the jury to find that Dr. Poliner was forced to agree to the abeyance under duress. [5]

_____

[5]  Defendants argue that even if the abeyance was procured by duress, it should be enforced because Dr. Poliner ratified/did not repudiate the abeyance.  (Defs.' Mot. at 8.)  Because this ratification/repudiation argument was not raised in Defendants' original motion for judgment as a matter of law, the issue has been waived.

Second, the Medical Staff Bylaws authorized the Hospital to summarily suspend a physician's privileges when the acts of the physician constituted a present danger to the health of his patients.  (Pls.' App. at 352.)  The jury concluded that Defendants breached this provision of the Medical Staff Bylaws because Defendants did not have a reasonable belief that Dr. Poliner posed an imminent danger to the health of his patients.  (Jury Question No. 1.)  Defendants challenge this conclusion and contend that Dr. Knochel testified that he believed Dr. Poliner posed a present danger to the health of his patients and that there was no evidence to the contrary.  (Defs.' Mot. at 5-6.)

At trial, Dr. Knochel testified that he did not have enough information to assess whether Dr. Poliner posed a present danger to his patients at the time he forced Dr. Poliner to agree to the abeyance (*i.e.* summarily suspended Dr. Poliner).  (Pls.' App. at 74, 78.)  He threatened Dr. Poliner with suspension of his privileges if Dr. Poliner refused to sign the abeyance letter, even though "[w]e didn't determine that Dr. Poliner was a present threat to his patients at that particular point. That is why we asked for an abeyance to investigate it to see if he was in fact dangerous to his patients."  (Pls.' App. at 74.)  Dr. Knochel was prepared to suspend Dr. Poliner's privileges despite the fact that he did not know whether Dr. Poliner posed a present danger to his patients. Clearly, this evidence supports the jury's finding that Defendants did not have a reasonable belief that Dr. Poliner posed a present danger to the health of his patients at the time of the abeyance/summary suspension.

Finally, Article 11.04 of the Hospital Bylaws specifically incorporate the Medical Staff Bylaws' provisions for withdrawing staff privileges with due process.  (Defs.' App. at 396.)  The jury concluded that Defendants breached this provision of the Hospital Bylaws by failing to provide

Dr. Poliner with adequate notice and a hearing.  (Jury Question No. 3(3).)   At trial, there was evidence that none of the Defendants would discuss the patient cases with Dr. Poliner prior to his summary suspension and that Dr. Poliner was not provided any opportunity to be heard or any hearing of any kind prior to his summary suspension. (Pls.' App. at 95, 107, 125, 210.)   This evidence was sufficient to support the jury's finding that Defendants failed to provide Dr. Poliner with adequate notice and hearing procedures.

Contrary to Defendants' argument, the jury's answers to Questions 1, 2, and 3(3) can establish a breach of contract.  (Defs.' Mot. at 6.)  Jury Question No. 1 asks whether Defendants breached Article VIII - Part C: Section 2(a) of the Medical Staff Bylaws by not having a reasonable belief that Dr. Poliner posed a present danger to the health of his patients. Likewise, Jury Question No. 2 asks whether Defendants breached Article VIII - Part C: Section 3(a) of the Medical Staff Bylaws by not getting Dr. Poliner's voluntary consent to the abeyance.  Jury Question No. 3(3) asks whether Defendants breached Article 11.04 of the Hospital Bylaws by suspending Dr. Poliner's privileges without affording Dr. Poliner adequate notice and hearing procedures that were fair under the circumstances.

### D.  Breach of Contract Damages.

The jury awarded Dr. Poliner $30,000,000 in lost earnings for Defendants' breach of contract.  (Jury Charge Question No. 6.)  In their Motion for Judgment, Plaintiffs recognize that this award does not conform to the evidence and the jury instruction and therefore request a judgment in the amount of $10,526.55.[6]  (Pls.' Mot. at 26 n.6.)

Defendants argue that Dr. Poliner should not be awarded $10,526.55 for loss of earnings

---

[6] *See* Pls.' App. at 240B.

18

because the loss amounts related only to the Professional Association, not to Dr. Poliner individually. (Defs.' Mot. at 42.)  Defendants note that Jury Question No. 6 concerning breach of contract damages inquired only about Dr. Poliner individually, and therefore the $10,526.55 lost profit amount that related to the Professional Association, not to Dr. Poliner, is not recoverable. (Defs.' Mot. at 42.)  Defendants point out that while there was evidence that Dr. Poliner received a salary from the Professional Association, there was no evidence of his salary amount and no evidence that there was a reduction in his salary during the abeyance period.

At no time during the charge conference did anyone object to the omission of the Professional Association from Jury Question No. 6.  The failure to include the Professional Association in the contract damages question was a mere oversight.  The Court will not enter judgment for Defendant on this basis.

### E.  Contractual Immunity.

At trial, Defendants claimed that Dr. Poliner released any claims he had against Defendants by virtue of the language in Dr. Poliner's Application for Appointment.  Dr. Poliner's Application for Appointment releases Defendants from summary suspensions made in good faith and without malice.  Defendants argue there is no evidence to support the jury's finding in Jury Question No. 5 that the summary suspension was not made in good faith and without malice.

At trial, the jury heard Dr. Knochel testify that he did not have enough information to assess whether Dr. Poliner posed a present danger to his patients at the time he asked Dr. Poliner to agree to the abeyance.  (Pls.' App. at 74, 78.)  He threatened Dr. Poliner with suspension of his privileges if Dr. Poliner refused to sign the abeyance letter, even though "[w]e didn't determine that [Dr. Poliner was a present threat to his patients at that particular point.  That is why we asked for an

abeyance to investigate it to see if he was in fact dangerous to his patients." (Pls.' App. at 74.) Dr. Knochel was prepared to suspend Dr. Poliner's privileges despite the fact that he did not know whether Dr. Poliner posed a present danger to his patients. Clearly, this evidence supports the jury's finding that the suspension was not undertaken in the reasonable belief that Dr. Poliner posed a present danger to the health of his patients.  The jury also heard Dr. Knochel testify that he informed Dr. Poliner that Dr. Poliner must agree to an abeyance of his cath lab privileges or Dr. Knochel would terminate all his hospital privileges immediately.  (Pls.' App. at 74-77, 179.)  Dr. Knochel did not offer Dr. Poliner any other options that may have been less severe.  (Pls.' App. at 77.)  There was also evidence that Dr. Knochel told Dr. Poliner that he was not permitted to consult an attorney. (Pls.' App. at 180.)  Additionally, Dr. Poliner's medical experts testified that no reasonable hospital could have taken the action it did against Dr. Poliner except by knowingly or recklessly disregarding the medical evidence.  (Pls.' App. at 99, 106, 137, 203, 208A.)  Furthermore, there was evidence at trial that none of the Defendants would discuss the patient cases with Dr. Poliner prior to his summary suspension and that Dr. Poliner was not provided any opportunity to be heard or any hearing of any kind prior to his summary suspension. (Pls.' App. at 95, 107, 125, 210.)  This evidence is sufficient to support the jury's finding in Jury Question No. 5 that the summary suspension was not made in good faith and without malice.

## V.  DEFAMATION.

Dr. Poliner seeks entry of judgment on the jury's defamation award against Dr. Knochel and the Hospital.  The jury found Dr. Knochel and the Hospital liable for injury to Dr. Poliner's reputation and career and for the mental anguish he suffered as a proximate result of the defamation. The jury awarded - and Dr. Poliner seeks to recover - (1) $20 million from Dr. Knochel and $15

million from the Hospital for injury to career and reputation and (2) $20 million from Dr. Knochel

and $15 million from the Hospital for mental anguish. (Jury Question No. 11.) Dr. Poliner elects

recovery in the amount of $70 million as actual damages for defamation. (Pls.' Mot. at 12-13.)[7]

### A. Elements of Defamation Claim.

#### 1. Statement.

Defendants contend there is no evidence that Defendants made a false and defamatory

statement of and concerning Dr. Poliner. The Court disagrees.

Although Defendants maintained at trial that Dr. Poliner agreed to the abeyance, as required

by the Hospital Bylaws, the evidence established that Dr. Knochel told Dr. Poliner that if he did not

agree to the abeyance, Dr. Poliner's privileges would be summarily suspended. (Pls.' App. at 75-77,

179.) Thus, the jury found that Dr. Poliner did not voluntarily agree to the abeyance. Because the

abeyance was not voluntarily agreed to, the inference is that Dr. Knochel summarily suspended Dr.

Poliner's privileges on May 14, 1998. According to the Medical Staff Bylaws, the basis for any

summary suspension is that the practitioner's acts "constitute a present danger to the health of his

patients." (Pls.' App. at 352.) By summarily suspending Dr. Poliner's cath lab privileges,

Defendants made a statement that Dr. Poliner was a physician whose practice posed an imminent

danger to the health and lives of his cardiac patients - in other words, that he was a dangerous

doctor. This evidence is sufficient to support the jury's finding in Jury Question No. 7 that

---

[7] There is no doubt the jury awarded Dr. Poliner a tremendous amount of money in damages. The jury's attitude and award was influenced by Defendants' unwillingness to acknowledge their own wrongdoing and their callous attitude toward Dr. Poliner at the time of the abeyance/suspension and at trial. Defendants' insistence on taking the position that Dr. Poliner voluntarily agreed to the abeyance caused Defendants to lose credibility with the jury. Likewise, Defendants' cavalier attitude toward Dr. Poliner's situation and their unwillingness to acknowledge any mismanagement of his case demonstrated a callousness that influenced the jury's decision.

Defendants made a defamatory statement referring to Dr. Poliner in connection with the suspension of Dr. Poliner's cardiac catheritization privileges.[8]

### 2. Falsity.

At trial, the jury heard evidence supporting their finding that Dr. Poliner was not a dangerous doctor who posed a present danger to the health of his patients. For example, three of the four cases at issue in the abeyance letter involved patients Dr. Poliner had treated months prior; thus, those cases could not have posed an immediate danger. (*See. e.g.,* Court's Order dated September 30, 2002 at 22.)   Additionally, Dr. Knochel testified that he did not have enough information to determine if Dr. Poliner posed an imminent danger at the time of the forced abeyance. (Pls.' App. at 74, 78.) Moreover, three physicians at the Hospital, as well as three cardiology experts, testified at trial that there was no reasonable basis to characterize Dr. Poliner as a danger to his patients or to restrict his privileges. (Pls.' App. at 71, 92, 98, 99-100, 109, 118, 200.) This evidence is sufficient to support the jury's finding in Jury Question No. 8 that the defamatory statement was not true.

### 3. Publication.

Defendants also argue there was no evidence to support the jury's finding in Jury Question No. 7 that a publication occurred. However, as Plaintiffs point out, there was evidence at trial of

---

[8] Defendants contend that the statement that Dr. Poliner is a dangerous doctor is non-actionable opinion. (Defs.' Mot. at 23-24.) However, the Supreme Court has held that there is no "wholesale defamation exemption for anything that might be labeled as 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990). In fact, where, as here, expressions of opinion ("In our opinion, Dr. Poliner is a dangerous doctor") imply an assertion and knowledge of objective facts, such an opinion - if false - may be actionable. *See id.* at 17-20. Defendants contend in a conclusory fashion that their opinion that Dr. Poliner was a dangerous doctor is not an objectively verifiable fact. The Court hopes Defendants are not saying that their decisions to summarily suspend physicians are not based on objectively verifiable facts, such as medical data and records.

publication in the form of oral and written statements to third parties.  For example, Plaintiffs produced a memo from Dr. Knochel to another physician, Dr. Brockie, concerning Dr. Poliner's abeyance status.  (Pls.' Tr. Ex. 82.)  This memo was carbon copied to several others as well.  (Pls.' Tr. Ex. 82, Pls.' App. at 181.)  Additionally, Dr. Poliner repeatedly notified Dr. Knochel (May 21 and May 26, 1998) of breaches in confidentiality surrounding his abeyance status.  (Pls.' App. at 249, 250.)  Further, there was evidence that Dr. Poliner's referral sources expressed their concern to Dr. Poliner early on because they believed the abeyance status was injurious to his reputation. (Pls.' App. at 190, 250.)  Moreover, Dr. Knochel and the Hospital published the fact that Dr. Poliner's privileges had been placed in abeyance on several occasions in correspondence to third parties.  (Pls.' App. at 141, 253, 254.)

This evidence is sufficient to support the jury's finding in Jury Question No. 7 that Defendants made a publication.

### 4.  Defamation *per se.*

The jury found in Jury Question No. 9 that the statements made by Defendants were defamatory *per se*.  Defendants argue in their motion that defamation *per se* is not a valid construct under the law.  (Defs.' Mot. at 24.)  However, because Defendants did not raise this argument in their previous motion for judgment as a matter of law, the issue has been waived.

### 5.  Qualified Privilege.

The jury found in Jury Question No. 10 that Defendants' statements were not protected by a qualified privilege.  Defendants challenge that finding and argue they are entitled to the qualified privilege as a matter of law.  (Defs' Mot. at 27-28.)  However, even if the jury had found that Defendants had an "interest or duty to another person having a corresponding interest or duty

23

regarding the peer review action taken on May 14, 1998 or May 29, 1998," there is sufficient evidence that Defendants made the defamatory statement(s) with malice, which causes the privilege to be lost.

At trial, the jury heard Dr. Knochel testify that he did not have enough information to assess whether Dr. Poliner posed a present danger to his patients at the time he asked Dr. Poliner to agree to the abeyance. (Pls.' App. at 74, 78.) He threatened Dr. Poliner with suspension of his privileges if Dr. Poliner refused to sign the abeyance letter, even though "[w]e didn't determine that [Dr. Poliner was a present threat to his patients at that particular point. That is why we asked for an abeyance to investigate it to see if he was in fact dangerous to his patients." (Pls.' App. at 74.) Dr. Knochel was prepared to suspend Dr. Poliner's privileges despite the fact that he did not know whether Dr. Poliner posed a present danger to his patients. Clearly, this evidence supports the jury's finding that the suspension was not undertaken in the reasonable belief that Dr. Poliner posed a present danger to the health of his patients. The jury also heard Dr. Knochel testify that he informed Dr. Poliner that Dr. Poliner must agree to an abeyance of his cath lab privileges or Dr. Knochel would terminate all his hospital privileges immediately. (Pls.' App. at 74-77, 179.) Dr. Knochel did not offer Dr. Poliner any other options that may have been less severe. (Pls.' App. at 77.) There was also evidence that Dr. Knochel told Dr. Poliner that he was not permitted to consult an attorney. (Pls.' App. at 180.) Additionally, Dr. Poliner's medical experts testified that no reasonable hospital could have taken the action it did against Dr. Poliner except by knowingly or recklessly disregarding the medical evidence. (Pls.' App. at 99, 106, 137, 203, 208A.) Furthermore, there was evidence at trial that Defendants would not discuss the patient cases with Dr. Poliner prior to his summary suspension and that Dr. Poliner was not provided any opportunity to be heard or any hearing of any

kind prior to his summary suspension. (Pls.' App. at 95, 107, 125, 210.)  Thus, there was sufficient

evidence at trial for the jury to have found that Defendants made the defamatory statement(s) with

malice, and therefore, Defendants are not entitled to the qualified privilege.

### 6. Damages.

Dr. Poliner seeks to recover the damages awarded to him for injury to his career and

reputation as well as for mental anguish.  (Jury Question No. 11.)  In accordance with the jury's

verdict, Dr. Poliner elects recovery in the amount of $70 million as actual damages for defamation.

(Pls.' Mot. at 12-13.)

Defendants challenge the jury's damage award by arguing that there was no evidence that

any defamatory publication was the proximate cause of any of Dr. Poliner's damages. (Defs.' Mot.

at 28, 43.)  In this case, the Jury Charge specifically explained that in the case of a defamation *per

se* claim, general damages are presumed.  *See Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325 (5th

Cir. 1993); 30 Tex. Jur. 3d Libel and Slander § 24 (2005).  This jury found Defendants liable for

making a defamatory *per se* statement and therefore, the jury was permitted without other evidence

to determine the amount of damages.  In their verdict, the jury found Defendants liable in varying

amounts for Dr. Poliner's loss of earnings, injury to career and reputation, and mental anguish.

Defendants argue there was no evidence that Defendant suffered any damages to his

reputation as a result of any statement about the May 14, 1998 abeyance or the May 29, 1998

extension.  (Defs.' Mot. at 28, 43.)  They argue there was no evidence that Dr. Poliner's referral

doctors even knew about the abeyance of May 14, 1998 or the extension.  (Defs.' Mot. at 28.)

At trial, Dr. Poliner testified that before signing the May 14, 1998 abeyance letter, his

"referral base was growing" and he was treating a "large number of patients."  (Pls.' App. at 175.)

25

He testified that before the abeyance letter he was "busy in the cardiac cath lab" and was "working just about every day." (Pls.' App. at 183.)  He further testified that after signing the letter of abeyance, his referral base was gone, "the phones stopped ringing." and the "practice was gone." (Pls.' App. at 183.)  He said he "didn't have any patients after that.  There were no referrals." (Pls.' App. at 183.)  Dr. Poliner testified that the day after he signed the abeyance letter he received a phone call from one of his referring physicians, Dr. Marty Cohen, concerning the abeyance. (Pls.' App. at 182-83.)  Dr. Cohen testified that he knew of Dr. Poliner's problems with the Hospital in May of 1998 and stopped referring patients to Dr. Poliner as a result thereof.  (Tr. Transcript at Vol. 3, P. 805.)  On May 21 and again on May 26, 1998, Dr. Poliner sent letters to Dr. Knochel expressing his concern that his referring physicians had learned of the abeyance.  (Pls.' Tr. Ex. 82.) Dr. Poliner wrote that his referring physicians had expressed concern that the situation had been "injurious to [his] reputation."  (Pls.' App. at 187; Pls.' Tr. Ex. 90.)

This evidence is sufficient to support the jury's finding that the abeyance caused injury to Dr. Poliner's career and reputation.

Defendants also make the disingenuous argument there was no evidence of the "nature, duration, or severity of the plaintiff's mental anguish." (Defs.' Mot. at 43.)  In fact, Dr. Poliner's evidence certainly established that he suffered mental anguish as a proximate result of the forced abeyance of May 14, 1998.  (Pls.' App. at 144, 198, 213-14, 227-31, 237-38.)

**B.  Statute of Limitations.**

Defendants request that the Court enter judgment as a matter of law in favor of their argument that Dr. Poliner's defamation claim is barred by the one-year statute of limitations set forth at Tex. Civ. Prac. & Rem. Code Ann. § 16.002(a).  Defendants argue that because Plaintiffs' lawsuit

was filed on May 11, 2000, Dr. Poliner cannot recover for any publications of the defamatory statement made on or before May 11, 1999. (Defs.' Mot. at 22.) Defendants maintain that the May 14, 1998 abeyance occurred more than one year before Dr. Poliner filed suit and there is no evidence that Defendants published the fact of the abeyance to any third party at any time then or thereafter. (Defs.' Mot. at 22.) Defendants further argue that Plaintiffs cannot recover for any republications that occurred after May 11, 1999 because "[t]he record is completely devoid of any alleged republications of the Abeyance that occurred within one year before the suit was filed." (Defs.' Mot. at 22.)

In response, Plaintiffs argue that the fact of the abeyance was republished within the limitations period. (Pls.' Resp. at 27.) In support of their argument, Plaintiffs refer to two republications in particular - first, the December 14, 1999 "Verification of Privileges" letter that was signed by Dr. Knochel and that stated that Dr. Poliner's "privileges have been temporarily restricted at this hospital" and second, a credentialing application signed by Dr. Knochel on January 5, 2000 in which Dr. Knochel indicated "yes" to questions inquiring about whether Dr. Poliner's hospital privileges had been restricted. (Pls.' App. at 253-55.)

Defendants argue that Plaintiffs have failed to establish that the statements contained in these documents were in fact republications *regarding the abeyance,* and therefore Plaintiffs did not prove the statements to be defamatory. (Defs.' Reply at 5, 5 n.4.) Defendants note that there was testimony at trial that the credentialing application relied on by Plaintiffs referred to the immune suspension, not to the actionable abeyance. (Tr. R. Vol. 7 at 1636-37.) Defendants argue that because Plaintiffs failed to prove that the documents referred to the May abeyance, they cannot prove a republication of the abeyance occurred within the limitations period. (Defs.' Reply at 5, 5

27

n.4.)

Defendants raised their Rule 8(c) affirmative defense of statute of limitations at the pleading stage and moved for summary judgment with respect to Plaintiffs' defamation claim on that basis. After reviewing the republication documents relied on by Plaintiffs, the Court denied Defendants' motion for summary judgment because Plaintiffs had presented evidence sufficient to raise a fact issue as to whether a defamatory republication was made within one year of filing the lawsuit. (Court's Order of Sept. 30, 2003 at 33.)  Accordingly, the Court found that resolution of this issue was best left to the trier of fact at trial.

Defendants' argument appears to merge two distinct issues into one: First, that Plaintiffs' evidence was insufficient as a matter of law to establish that the two republication documents were defamatory (*i.e.* of and concerning the abeyance) and second, that because the alleged republication documents were not defamatory, Plaintiffs' defamation claim is barred by limitations.

Defendants argue in an obscure footnote that Plaintiffs failed to establish that the credentialing application referenced the May abeyance action.  (Defs.' Reply at 5-6 n.4.)  The consequence of this failure would be that Plaintiffs failed to establish an actionable defamatory publication.  Defendants now seek judgment as a matter of law based on the insufficiency of the evidence of a defamatory publication.  Yet Defendants' Rule 50(b) argument (contained in their reply brief) that the documents do not establish a defamatory republication was not raised in their Rule 50(a) motion, or at any time prior to the jury's deliberation.  Nowhere in their Rule 50(a) motion did Defendants argue that the documents relied on by Plaintiffs (which were introduced at summary judgment and admitted into evidence during trial) were insufficient to prove that a defamatory publication was made.  Because Defendants failed to alert Plaintiffs to the fact that they

believed the evidence to be insufficient on this basis, the issue has been waived.[9]

With respect to the statute of limitations argument, Defendants had the burden at trial of establishing that the republications were barred by limitations.  To prove this, Defendants were required to obtain a jury finding on the fact issue in their favor.  By failing to request a proper jury question on this issue, Defendants failed to get a jury finding on the issue.  Defendants' proposed jury instruction on the statute of limitations was improperly enmeshed with their damages instruction and stated that "you are instructed that you may only consider damages, if any, that were proximately caused by publications, if any, that were made after May 11, 1999." (Defs.' Proposed Jury Charge at 27.)  This instruction was insufficient because it did not require the jury to determine whether a defamatory publication was made within the limitations period.  Because Defendants failed to propose a proper jury instruction, they failed to obtain a jury finding on this fact issue and thus failed to meet their burden of proving their affirmative defense.

The Court must next consider whether Defendants waived their statute of limitations affirmative defense by their conduct.  Generally, a defendant waives his affirmative defense by failing to raise it in his answer.  *See Moore v. Tangipahoa Parish Sch. Bd.*, 594 F.2d 489, 495 (5th Cir. 1979).  However, an affirmative defense, even though properly pleaded, may be waived by a defendant's conduct.  *See, e.g., Fedders Corp. v. Taylor*, 473 F. Supp. 961, 970 (D. Minn. 1979); *Guglielmo v. Scotti & Sons, Inc.*, 58 F.R.D. 413, 420 (W.D. Pa. 1973)*.*

In *Guglielmo v. Scotti & Sons, Inc.*, 58 F.R.D. 413, 420 (W.D. Pa. 1973), the court held that a defendant can waive a pleaded defense by conduct - for example, by not moving for a directed

---

[9]  Additionally, Defendants failed to request a specific jury question on this issue that would have enabled them to ask the Court for review of that finding based on insufficiency of the evidence.  For example, Defendants should have requested a question asking whether any statement published by Defendants after May 11, 1999 was defamatory.

verdict on grounds of that defense, requesting a binding charge that would be completely inconsistent with facts necessary to make out such a defense, and acquiescing to the court's charge that does not submit factual issues of such a defense to the jury.

Likewise, in *Fedders Corp. v. Taylor*, 473 F. Supp. 961, 970 (D. Minn. 1979), the court held that although the defendant pled the affirmative defense, the defense was waived because no evidence was presented at trial in support of the affirmative defense and no evidence was presented as to damages that might have been suffered in connection with such defense.

In this case, although Defendants pled the affirmative defense, they failed to raise this limitations issue in their Rule 50(a) motion. Additionally, Defendants' Rule 50(b) discussion of the issue was both minimal and vague - and relegated to a footnote in their reply brief. (Defs.' Reply at 5-6 n.4.) As explained *supra*, Defendants' proposed jury instruction on the statute of limitations defense was improper. Moreover, Defendants failed to make any objection to the Court's Charge to the Jury, which did not contain a statute of limitations question for the jury.

Because Defendants, through their conduct, repeatedly failed to identify the nature of their limitations defense and failed to preserve it, the Court concludes that Defendants waived their statute of limitations affirmative defense.

## VI.  TORTIOUS INTERFERENCE.

Again, Defendants contend there was no evidence to satisfy any element of Plaintiffs' tortious interference claims. To prevail on a claim of tortious interference with business relations under Texas law, a plaintiff must prove (1) the existence or prospect of a contract, (2) an intentional and willful act interfering with the contract that was calculated to cause damage to the plaintiff, and (3) damages. *See Kiepfer v. Beller*, 944 F.2d 1213, 1220 (5th Cir. 1991). Furthermore, to establish

liability for tortious interference, the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. *See Wal Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713 (Tex. 2001).

At trial, Dr. Poliner provided sufficient evidence of each of the elements of his tortious interference claim. Dr. Poliner's undisputed testimony was that prior to May 14, 1998 and his signing of the abeyance letter, his "referral base was growing" and he was treating a "large number of patients." (Pls.' App. at 175.) He further testified that he was "busy in the cardiac cath lab" and was "working just about every day." (Pls.' App. at 183.) There is no question that Defendants knew of Dr. Poliner's referral business.

Likewise, the evidence before the jury was sufficient to allow it to conclude that Defendants acted with malice; that is, that Defendants' acts of forcing Dr. Poliner to sign the abeyance letter, their decision to suspend his privileges without adequate investigation, and their unwillingness to provide Dr. Poliner with an opportunity to be informed or heard regarding the patient cases at issue wrongfully interfered with his ability to perform or enter into patient contracts.

The Fifth Circuit has expressly held that a physician may recover for tortious interference when the contracts at issue arise from other physicians. *See Kiepfer v. Beller*, 944 F.2d 1213, 1220 (5th Cir. 1991). Dr. Poliner sufficiently proved that his damages - the complete loss of his referral practice - was a proximate result of the abeyance/summary suspension and breaches of confidentiality surrounding it. Because the abeyance resulted in Dr. Poliner being barred from the cath lab, he was unable to continue his practice. (Pls.' App. at 72.) Dr. Poliner testified that after signing the letter of abeyance, his referral base was gone, "the phones stopped ringing," and the "practice was gone." (Pls.' App. at 183.) He said he "didn't have any patients after that. There were no referrals." (Pls.' App. at 183.) Dr. Poliner testified that the day after he signed the

31

abeyance letter he received a phone call from one of his referring physicians, Dr. Marty Cohen, concerning the abeyance. (Pls.' App. at 182-83.) Dr. Cohen testified that he knew of Dr. Poliner's problems with the Hospital in May of 1998 and stopped referring patients to Dr. Poliner as a result thereof. (Tr. Transcript at Vol. 3, P. 805.) On May 21 and again on May 26, 1998 Dr. Poliner sent letters to Dr. Knochel expressing his concern that his referring physicians had learned of the abeyance. (Pls.' Tr. Ex. 82.) Dr. Poliner wrote that his referring physicians had expressed concern that the situation had been "injurious to [his] reputation." (Pls.' App. at 187; Pls.' Tr. Ex. 90.) This evidence is sufficient to support the jury's finding that the abeyance caused injury to Dr. Poliner's career and reputation. Additionally, Dr. Poliner's evidence established that he suffered mental anguish as a proximate result of the forced abeyance on May 14, 1998. (Pls.' App. at 144, 198, 213-14, 227-31, 237-38.)

Finally, there was sufficient evidence to establish that Defendants' conduct was independently tortious or unlawful. *See Sturges*, 52 S.W.3d at 713. As stated *supra*, Defendants' conduct satisfied the elements of Plaintiffs' defamation claim and his breach of contract claim.

Thus, the Court concludes that this evidence is sufficient to support the jury's findings in Jury Questions Nos. 14 and 15 that Defendants are liable for tortiously interfering with Dr. Poliner's existing and prospective contracts.[10]

Defendants argue there was no evidence of tortious interference damages. (Defs.' Mot. at 43.) They contend - as they did with the defamation claim - that there was no quantifiable evidence of injury to reputation/career or mental anguish. For the reasons stated *supra*, the Court disagrees. The evidence was sufficient to support the jury's awards for injury to reputation and career as well

---

[10] Defendants' defenses of justification and statute of limitations are waived because they were not raised in Defendants' original Rule 50(a) motion. (Defs.' Mot. at 35-36.)

as mental anguish as a result of Defendants' tortious interference with Plaintiffs' actual and

prospective contracts.  (Jury Charge Question No. 17.)[11]

## VII.  MISCELLANEOUS DAMAGES ISSUES.

### A.  Recoverable Damages.

Plaintiffs sought to recover damages awarded for their contract and defamation claims.

However, the Court held *supra* that Plaintiffs are entitled to recover for only one of their claims.

Because Plaintiffs did not elect between their defamation claim and their breach of contract claim,

the court will award the judgment affording the greatest recovery.  *See Parkway Co. v. Woodruff*,

901 S.W.2d 434, 441 (Tex. 1995).  The jury awarded Plaintiffs the greatest recovery for their

defamation claim.  (Jury Question No. 11.)

### B.  Allocation of Damages.

Defendants argue that the jury had no evidence to allocate damages between the abeyance

and the suspension to determine damages exclusively limited to the abeyance period.  (Defs.' Mot.

at 39.)  However, there was evidence at trial reflecting a lost earnings amount of $10,526.55 during

the abeyance period.  Likewise, there was evidence at trial of Dr. Poliner's mental anguish caused

by the abeyance, which can be reduced to a dollar amount.  The Jury Charge specifically stated with

respect to defamation damages that the jury may compensate Dr. Poliner for damages that were

proximately caused by Defendants' actions "occurring on or before May 14, 1998 and/or May 29,

1998." (Defamatory Damages, p. 26.)  The jury was further instructed not to award damages for any

action taken on or after June 12, 1998.  The Jury Charge did not instruct the jury that the scope or

---

[11]  Defendants' argument that injury to career and reputation damages are not recoverable as a matter of
law for tortious interference claim has been waived because it was not raised in their original motion for judgment as
a matter of law.  (Defs.' Mot. at 43; Pls.' Resp. at 45.)

extent of Plaintiffs' injury and/or damages must be limited to a particular time period. However, the jury was instructed that any damages awarded should be limited to those resulting from the suspensions on May 14, 1998 and/or May 29, 1998. The Court will address the issue of the appropriate amount of damages in its order on Defendants' Motion for Remittitur.

### C. Constitutional Arguments.

Likewise, the Court will address Defendants' constitutional argument (Defs.' Mot. at 44-45, 47-49) in its order on Defendants' Motion for Remittitur. This argument is not appropriately raised in a renewed motion for judgment as a matter of law because it could not have been raised prior to the jury's verdict. The Court will address the constitutional arguments in its order on Defendants' Motion for Remittitur.

### D. Damage Amounts.

Plaintiffs seek entry of judgment on the jury's awards of actual damages, exemplary damages,[12] and on the issue of pre- and post-judgment interest. The resolution of all damage issues, including actual damages, exemplary damages, and interest amounts, will be resolved in the Court's order on Defendants' Motion for Remittitur.

## VIII.  MOTION FOR A NEW TRIAL.

A motion for a new trial may be granted only if the verdict is against the great weight of the evidence. *See Bernard v. IBP, Inc. of Neb.,* 154 F.3d 259 (5th Cir. 1998). For the reasons stated herein, the Court does not believe a new trial is warranted in light of the evidence presented. Therefore, to the extent Defendants' Motion for a New Trial is based on sufficiency of the evidence

---

[12] Defendants' argument concerning the sufficiency of the evidence to support an award of exemplary damages has been waived because Defendants failed to raise these arguments in their previous motion for judgment as a matter of law. (Defs.' Mot. at 46-47.)

or other evidentiary issues, the motion is hereby DENIED.  However, Defendants' Motion for a New Trial based on damages will be addressed in a subsequent order.

## CONCLUSION

In conclusion, the Court finds that Plaintiffs are entitled to judgment as a matter of law on their defamation claim.  The evidence at trial was also sufficient to satisfy the elements of Plaintiffs' breach of contract and tortious interference claims.  However, because the one satisfaction rule prevents Plaintiffs from recovering damages for both defamation and breach of contract, the Court has elected to enter judgment on Plaintiffs' defamation claim, per their request.

In light of the Court's ruling, the Parties are hereby directed to participate in mediation within sixty (60) days from the date of this order.  The Court will consider Defendants' Motion for Remittitur and Defendants' Motion for a New Trial if the mediation proves unsuccessful.

It is SO ORDERED, this 27th day of March 2006.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE