IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LAWRENCE R. POLINER, M.D. and | § | |
| LAWRENCE R. POLINER, M.D., P.A., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. |
| TEXAS HEALTH SYSTEMS, a Texas | § | 3:00-CV-1007-P |
| non-profit corporation, d/b/a PRESBYTERIAN | § | |
| HOSPITAL OF DALLAS, and JAMES | § | |
| KNOCHEL, M.D., | § | |
| | § | |
| Defendants. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Now before the Court are (1) Defendants' Texas Health Systems (Presbyterian Hospital of

Dallas) and James Knochel, M.D.'s Motion for Remittitur, filed September 16, 2005; (2) Defendants

Texas Health Systems (Presbyterian Hospital of Dallas) and James Knochel, M.D.'s Motion for a

New Trial, filed September 16, 2005; (3) Plaintiffs' Post-trial Petition for Attorneys' Fees, Expenses

and Costs; and (4) Defendants' motion for settlement credit, filed May 26, 2006[1]  After careful

consideration of the Parties' briefing and the applicable law, the Court hereby DENIES Defendants'

Motion for a New Trial, GRANTS in PART Defendants' Motion for Remittitur, DENIES in part as

MOOT and DENIES in part as premature Plaintiffs' Post-trial Petition for Attorneys' Fees, Expenses

and Costs, and DENIES Defendants' motion for settlement credit.

---

[1] In its Order dated March 26, 2006, the Court denied in part Defendants' Motion for a New Trial.  The remainder of that motion - that portion concerning damages - will be considered herein.

1

## *MOTION FOR NEW TRIAL*

**A.     ERRONEOUS EXCLUSION OF EVIDENCE AT TRIAL.**

In their Motion for a New Trial,[2] Defendants Texas Health Systems (Presbyterian Hospital of Dallas) ("Presbyterian" or "the Hospital") and James Knochel, M.D. ("Knochel") (collectively, "Defendants") argue that the Court's erroneous admission and exclusion of certain evidence warrants reversal and a new trial.  (Defs.' Br. at 16-17.)  Specifically, Defendants argue that the Court erroneously excluded evidence establishing that in November 1998, the Hearing Committee upheld Dr. Poliner's June 1998 summary suspension and found it justified.  (*citing* Trial Tr. Vol. 9 at 2099-2103; Defs.' App. at 95.)

At the summary judgment stage, the Court found as a matter of law that the June 1998 suspension was lawful and dismissed several defendants from the case on that basis.  Consequently, the theory of the case narrowed to the single issue of whether the May 1998 suspension/abeyance was lawful.  Because the jury was only to consider whether the circumstances surrounding the May abeyance/suspension gave rise to a cause of action and damages, the Court ruled that the fact that the Hearing Committee upheld the June summary suspension in November was deemed irrelevant and inadmissible.

The Court rejects Defendants' conclusory argument that the Court's decision to exclude such

---

[2] Local Rule 7.1(d) requires that a motion be accompanied by a brief that sets forth the movant's contentions of fact and/or law, and argument and authorities.  As Defendants are aware, motions shall concisely articulate the grounds therefor, whereas the brief is to contain the statement of facts, legal theories, legal arguments, and legal analysis.  The brief should contain all the information the Court needs to make its determination (with the exception of evidence).  Local Rule 7.2(c) states that a brief must not exceed twenty-five pages.  Defendants filed a twenty-one page brief along with a fifty-five page motion for a new trial.  Certainly, a fifty-five page motion is not a concise articulation of the grounds therefor.  Defendants' attempt to present fifty-five pages of facts and legal discussion in a motion is clearly an impermissible effort to circumvent the page limits.

evidence was harmful error.  Defendants offer no valid legal basis for reversing the ruling and therefore the Court declines to do so.

**B.      JURY CHARGE ERROR.**

Defendants also argue they are entitled to a new trial because of several errors in the jury charge.  First, Defendants argue that the Court erred in refusing to ask the jury to apportion the damages among each defendant.  Defendants maintain that Section 33.003 of the Texas Civil Practices and Remedies Code, which is the Proportionate Responsibility Statute, mandates that the jury shall determine the percentage of responsibility of each defendant.  (Defs.' Br. at 18.) Defendants conclude that "[b]ecause of the jury's failure to apportion damages, it is impossible to determine whether the jury intended to apportion damages according to the amounts awarded, or awarded damages against each defendant for the same injury."  (Defs.' Br. at 18-19.)

Section 33.003 provides that

> [t]he trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these: (1) each claimant; (2) each defendant; (3) each settling person; and (4) each responsible third party . . .

Tex. Civ. Prac. & Rem. Code § 33.003 (Vernon 1997 Supp. 2005).  Although Defendants did request an apportionment question in the jury charge, Defendants did not provide the Court with any legal authority supporting their request.  (Trial Tr. Vol. 10 at 2389-90.)  They never cited to the Texas Proportionate Liability Statute or any other legal source.

In the Court's Charge to the Jury, the Court specifically instructed the jury to consider each

defendant separately and not to include damages as to one defendant in assessing damages against any other defendant.  (*See* Jury Question No. 11.)  The jury charge listed each defendant separately and provided blanks next to each defendant's name for each element of recovery (*e.g.*, loss of earnings, injury to career and reputation, mental anguish).  The fact that the jury returned a verdict with different amounts for each defendant with respect to injury to career/reputation and mental anguish indicates that the jury apportioned the responsibility for the damages among the several defendants.  Because the jury did apportion the damages among the defendants, the Court finds there was no harmful error.

With respect to loss of earnings, the evidence at trial established that Plaintiffs' lost earnings amount was $10,526.55.  (*See* Trial Tr. Vol. 11 at 2544.)  The jury entered that entire amount next to each defendant's name.  The fact that the jury returned a verdict with the same amount for each defendant with respect to lost earnings indicates that the jury believed that each defendant's conduct proximately caused Plaintiffs to lose the entire lost earnings amount and that all defendants should be held liable for that amount.  The Court concludes that the jury intended to hold all Defendants responsible for one lost earnings amount, and consequently there is no harmful error.

Defendants also argue that a new trial is required because the jury was not asked to apportion the damages between Plaintiffs Dr. Poliner and his Professional Association.  (Defs.' Br. at 13.) They cite to section 71.010 of the Texas Civil Practices and Remedies Code which states that damages shall be divided by the jury among the individuals who are entitled to recovery. (Defs.' Br. at 13.)

Defendants did not request apportionment among Plaintiffs at any time during trial, in  any motion, or at the jury charge conference.  Not only has this argument been waived, it is disingenuous

and wholly without merit.  Chapter 71 of the Texas Civil Practices and Remedies Code is Texas'

Wrongful Death Statute and Section 71.010 applies only in wrongful death cases.

Second, Defendants argue that the Court erred in failing to include an agency issue or

instruction in the jury charge explaining that Presbyterian can only be liable through its agents and

employees.  (Defs.' Br. at 19.)[3]  They go on to state in a conclusory fashion that "Plaintiffs failed to

establish that the acts of [Dr. Knochel] fell within the scope of [Dr. Knochel's] general authority and

were in furtherance of Presbyterian's business and for the accomplishment of the object for which

[Dr. Knochel] was hired."  (Defs.' Br. at 19.)  The Court disagrees.

First, the jury charge did include an agency instruction in not one, but two instances.  (*See*

Court's Charge to the Jury at 2, 47.)  Second, the evidence at trial established unequivocally that Dr.

Knochel's unlawful conduct fell within the scope of his authority and was in furtherance of

Presbyterian's business and for the accomplishment of the object for which Dr. Knochel was hired.

In fact, there was no evidence to the contrary.  Moreover, the jury's finding of liability against the

Hospital was appropriate in light of the testimony and conduct of the Hospital's Vice-President for

Medical Staff Affairs and its President, who supported Dr. Knochel's conduct at the time it occurred

and at trial.  Those administrators testified that they believed Dr. Knochel acted fairly and

appropriately under the circumstances.

Defendants also argue they are entitled to a new trial because the Court erred by submitting

the same damages elements multiple times, thereby presenting the danger of multiple recoveries.

(Defs.' Br. at 19.)  To the extent Defendants are arguing that the Court erred by submitting a

damages question to the jury for each of the different causes of action, such as breach of contract,

---

[3]  This issue, while unrelated to damages, was not resolved in the Court's March 26, 2006 Order.

5

defamation, tortious interference, etc., that issue is moot because the one-satisfaction rule limits Plaintiffs' recovery to one claim.  Additionally, the jury was specifically instructed to consider each defendant separately with respect to damages, thereby obviating the risk of a double recovery.  The hospital administrators were consulted and agreed with the summary suspension decision and with the procedure utilized.  By its verdict, the jury found Dr. Knochel the most culpable of the defendants, then the Hospital, and lastly, Drs. Levin and Harper.

For these reasons, the remainder of Defendants' Motion for a New Trial is hereby DENIED.[4]

### *MOTION FOR REMITTITUR*

**A.    BACKGROUND**

In an order dated March 27, 2006, this Court held that the one-satisfaction rule requires Plaintiffs to elect one of their alternative claims for entry of judgment.  Accordingly, per Plaintiffs' request, the Court entered judgment on Plaintiffs' defamation claim.[5]

The jury awarded Dr. Poliner $90,010,526.55 in actual damages as compensation for the defamatory statements made against him by Defendants Knochel, Harper, Levin and Presbyterian. The Jury Charge specifically instructed the jurors to consider each defendant separately and not to include damages as to one defendant in assessing damages against any other defendant.  (*See* Jury Question No. 11.)

With respect to Dr. Knochel, the jury awarded Dr. Poliner $10,526.55 in economic damages,

---

[4]  The issue of whether the damage awards are excessive is addressed herein as part of the Court's discussion concerning remittitur.

[5]  Because Plaintiffs elected for judgment on their defamation claim rather than their breach of contract claim, Plaintiffs' Post-trial Petition for Attorneys' Fees, Expenses, and Costs is hereby denied with respect to Plaintiffs' recovery of attorneys' fees.  However, as the prevailing party, Plaintiffs are entitled to recover their costs. *See* Fed. R. Civ. P. 54(d)(1).  Upon entry of judgment, Plaintiffs are entitled to resubmit their bill of costs.

$20 million in mental anguish damages and $20 million in injury to reputation and career damages. With respect to Presbyterian, the jury awarded Dr. Poliner $10,526.55 in economic damages, $15 million in mental anguish damages and $15 million in injury to reputation and career damages. The jury also found that Plaintiffs were entitled to recover exemplary damages in the amount of $110 million. The jury held Dr. Knochel responsible for $40 million and Presbyterian responsible for $50 million of that amount.

## B.    LEGAL PRINCIPLES FOR REMITTITUR.

In their Motion for a New Trial, Defendants argue that the actual and exemplary damages found by the jury are unsupportable and excessive such that a new trial is warranted. In the alternative, Defendants argue in their Motion for Remittitur that the jury's award of $70,010,526.55 in actual damages against Dr. Knochel and Presbyterian is excessive and contrary to right reason, thereby necessitating a remittitur.

There is a strong presumption in favor of affirming a jury award of damages. *See Hughes v. Ford Motor Co.*, 204 F. Supp. 2d 958, 964 (N.D. Miss. 2002). The court may not reverse a jury verdict for excessiveness except on the "strongest of showings." *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. *See id.* Yet, when a jury's award exceeds the bounds of any reasonable recovery, the court must grant a remittitur. *See id.* Decisions on motions for new trial and remittitur are committed to the sound discretion of the trial court. *See Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985); *Hughes*, 204 F. Supp. 2d at 964.

Trial courts should employ remittitur for those verdicts that are so large as to be contrary to right reason, whereas a new trial should be ordered when the jury's damage award was infected by

7

passion or prejudice.  *See Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683-84 (5th Cir. 1986); *Smith v. City of Seven Points*, 608 F. Supp. 458, 463 (E.D. Tex. 1985).  If the court believes that a remittitur is more appropriate, it must first offer the plaintiff a choice between accepting a reduction in damages or proceeding with a new trial.  *See Smith*, 608 F. Supp. at 463.

In reducing the level of damages, the court may not simply substitute its opinion concerning the proper amount for that of the jury.  *See id.*  The rules governing remittitur vary by jurisdiction. They may be provided for specifically in a statute or court rules, or developed through case law. Texas courts determine the size of the remittitur in accordance with the judge-made "maximum recovery rule," which prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded.  *See Caldarera*, 705 F.2d at 784.  The court "will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction."  *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002).  The maximum recovery rule does not limit an award to the highest amount previously entered in the jurisdiction, but instead does not become operative unless the award exceeds 133% of the highest previous recovery in the relevant jurisdiction for a factually similar case.  *See id.*  Because the facts of each case are different, prior damages awards are not always controlling; the rule does not apply when unique facts or circumstances are present that are not reflected within the controlling caselaw. *See id.*

If a new trial is warranted and if it is clear that the issue of damages is independent of those issues relating to liability, the new trial, if any, may be limited to the question of damages.  *See Smith,* 608 F. Supp. at 465.

### C.    REMITTITUR/NEW TRIAL ANALYSIS.

When deciding whether it is appropriate to set either a remittitur or a new trial, the Court must resolve several issues: First, was the verdict excessive?  Second, if the verdict was excessive, was the jury motivated by passion or prejudice?  Third, if the verdict was excessive, but was not motivated by passion or prejudice, what was the maximum amount the jury could have awarded given the evidence submitted and the applicable law?  And finally, how much should the damages be reduced in order to set a proposed remittitur?

### 1.    Excessiveness of Verdict.

The first issue the Court must resolve is whether the verdict was excessive.  With respect to economic damages, the evidence at trial reflected a total lost earning amount of $10,526.55.  The jury verdict held each defendant responsible for $10,526.55, thereby indicating that the jury believed each defendant's conduct proximately caused Plaintiffs to lose the entire lost earnings amount.  The Court concludes that the jury intended to hold all Defendants responsible for one lost earnings amount.  This amount is not excessive.

The jury also awarded Dr. Poliner $35 million for injury to his reputation/career.  Although it is difficult to calculate an amount to fairly and reasonably compensate someone for the damage to their career/reputation, the law requires juries to do so.  Dr. Poliner's career was decimated by Defendants' actions.  The evidence at trial established that Dr. Poliner had an impressive and unblemished career in cardiology prior to these events.  Dr. Poliner attended college at Notre Dame University and studied medicine at Cornell Medical School.  After doing his residency in Colorado and spending some time in the United States Air Force, Dr. Poliner went into a fellowship program at University of Texas Southwestern Medical School in cardiology, where he eventually became a

faculty member.  After spending some years in academia at University of Texas Southwestern Medical School and at Baylor College of Medicine, Dr. Poliner was recruited to head a heart institute in Kansas.  He spent many years practicing in Kansas and spent some time practicing cardiology in Indiana.  In 1996, Dr. Poliner moved to Dallas to practice medicine with a large physicians' group. He left that group in June 1997 and began his own cardiology practice with privileges at Presbyterian.  According to the testimony at trial, Dr. Poliner had never had his medical license questioned, had never been asked to agree to an abeyance, and had never been sued for malpractice.

While working in Dallas at Presbyterian, Dr. Poliner practiced emergency cardiac medicine and, in an effort to build up his private practice, was relying almost solely on emergency room physician referrals for his business.  While at Presbyterian, his referral base grew steadily and he was doing a large volume of work in the cath lab.

After being labeled by Defendants as a "dangerous doctor," the emergency room doctors stopped referring patients to him, lest they be blamed for sending a patient to an unsafe doctor. Consequently, Dr. Poliner was unable to sustain any kind of practice at Presbyterian.  Although he had courtesy privileges at Medical City Dallas, his referral practice had dried up.

While there is no doubt that Dr. Poliner's evidence established that he suffered a massive injury to his reputation/career, there was no evidence that he suffered damages in the amount of $35 million.  That amount is not reasonable and is excessive.

The jury also awarded Dr. Poliner $35 million for mental anguish suffered by Knochel's and Presbyterian's tortious conduct.  Mental anguish is recoverable when it causes a substantial disruption in daily routine or a high degree of mental pain and distress.  *See Bently v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002).  Dr. Poliner testified that the ordeal and the ensuing litigation caused

him to lose sleep, cost him time with his family, caused him to spend innumerable hours with lawyers and work on the lawsuit, disrupted his family life, distressed his children, and cost him his career.  He explained that people in the medical community viewed him with disdain and he suffered great embarrassment and humiliation.  Dr. Poliner's wife (who worked with Dr. Poliner) testified that Dr. Poliner's life and personality changed dramatically as a result of this ordeal.  She testified that following the abeyance, he worked day and night on this matter- reviewing records, consulting with doctors for their testimony at his hospital hearing(s), making copies of documents, and hiring others to help.  She testified that Dr. Poliner was no longer a confident physician who enjoyed his profession, his family, and his life.  She testified that this experience made Dr. Poliner and the mood of their entire family anxious and sad.

The record leaves no doubt that Dr. Poliner suffered mental anguish as a result of Defendants' statements.  Although the humiliation and mental anguish suffered by Dr. Poliner are abstract and speculative elements of damages that are not susceptible to precise calculation, the Court finds that $35 million is not a rational amount of damages based on the evidence.

The jury's punitive damage award against Defendants Knochel and Presbyterian totaled $90 million.  At trial, the jury heard Dr. Knochel testify that he did not have enough information to assess whether Dr. Poliner posed a present danger to his patients at the time he asked Dr. Poliner to agree to the abeyance.  Dr. Knochel threatened Dr. Poliner with suspension of his privileges if Dr. Poliner refused to sign the abeyance letter, even though "[w]e didn't determine that [Dr. Poliner] was a present threat to his patients at that particular point.  That is why we asked for an abeyance to investigate it to see if he was in fact dangerous to his patients."  Dr. Knochel was prepared to suspend Dr. Poliner's privileges despite the fact that he did not know whether Dr. Poliner posed a

present danger to his patients. The Hospital's representative testified that this procedure was "appropriate and sanctioned." This evidence supports the jury's finding that the suspension was not undertaken in the reasonable belief that Dr. Poliner posed a present danger to the health of his patients and was in violation of the Hospital bylaws. The jury also heard Dr. Knochel testify that he informed Dr. Poliner that Dr. Poliner must agree to an abeyance of his cath lab privileges or Dr. Knochel would terminate all his hospital privileges immediately. Dr. Knochel did not offer Dr. Poliner any other options that may have been less severe. The Hospital's representative testified that this threat was "acceptable for an abeyance procedure." There was also evidence that Dr. Knochel told Dr. Poliner that he was not permitted to consult an attorney. Additionally, Dr. Poliner's medical experts testified that no reasonable hospital could have taken the action it did against Dr. Poliner except by knowingly or recklessly disregarding the medical evidence. Furthermore, there was evidence at trial that none of the Defendants would discuss the patient cases with Dr. Poliner prior to his summary suspension and that they did not provide Dr. Poliner with an opportunity to be heard or any hearing of any kind prior to his summary suspension. Although this type of malicious conduct can warrant the imposition of punitive damages, the Court finds that $90 million is excessive.

### 2.      Jury Motivation.

Having determined that $160 million is an excessive verdict based on the evidence presented, the Court must now determine whether the jury was motivated by passion and prejudice in arriving at the total. *See Smith v. City of Seven Points*, 608 F. Supp. 458, 463 (E.D. Tex. 1985). When an award is so exaggerated as to indicate bias, prejudice, corruption, or improper motive, the only proper remedy is a new trial. *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683-84 (5th Cir. 1986). In the alternative, if the Court determines that the verdict was contrary to right reason, but was not

12

the product of passion or prejudice, Plaintiffs will be offered the choice between remittitur or a new trial.

Resolution of this issue requires great reliance on the discretion of the trial court. *See Smith*, 608 F. Supp. at 463. Based on the judge's observation of the trial, he or she must determine whether the jury was impassioned or prejudiced against the defendants. *See id.*

There is no doubt that the size of this award clearly reflects the jury's desire to punish these Defendants and to compensate Dr. Poliner for the loss of his career. The fact that Dr. Poliner, his witnesses, and his counsel may have become emotional at times during the trial does not establish that the jurors' damages assessment was infected by passion or prejudice. Rather, after presiding over the trial, listening to the testimony, and observing the jurors, the Court concludes that their desire to punish Defendants and to compensate Dr. Poliner for the loss of his career was a product of reason - not emotion - resulting from a rational deduction that such action was necessary to compensate Dr. Poliner and to effect change in Defendants' conduct in the future.

Dr. Poliner presented himself as a committed and dedicated doctor who was good at and enjoyed his profession. He was respected by his peers and had accumulated an impressive and unblemished career. Defendants came across as arrogant, uncaring, and completely unconcerned with damaging Dr. Poliner's career. The law is obviously written to encourage hospitals and doctors to engage in peer review to correct or eliminate dangerous doctors. However, the law does not encourage callous attempts to find dangerous doctors without concern for doctors' careers and in violation of the hospital's own bylaws and fundamental rules of fairness.

There was nothing in the jurors' behavior to indicate that they were predisposed to Plaintiffs. In light of this conclusion, the Court finds that a remittitur is appropriate.

### 3.    Application of the Maximum Recovery Rule.

Having determined that remittitur is appropriate, the Court must determine whether the Maximum Recovery Rule applies in this case.  As stated *supra*, because the facts of each case are different, prior damages awards are not always controlling; the rule does not apply when unique facts or circumstances are present that are not reflected within the controlling caselaw.  *See Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002).

Defendants direct the Court's attention to several cases involving medical peer review/suspension of physician staff privileges as well as some defamation cases.  Of the cases cited by Defendants, the most analogous is *Rea v. Hosp. Corp. of Am.*, 892 F. Supp. 821 (N.D. Tex. 1993) (Solis, J.).  In *Rea,* the court awarded damages for tortious interference with business relations claims involving two physicians' ten-month suspensions of hospital privileges.  The court awarded the plaintiffs $197,928.00 in lost earnings damages and $200,000 in punitive damages.

*Rea* and this case do have some similarities - both cases involved physicians who were initially suspended, but ultimately reinstated.  Both cases involved defendant hospitals that failed to follow their own bylaws and failed to give the plaintiffs fair notice and opportunity to be heard.  Both cases involved personality clashes between the defendants and the plaintiff physicians.  Both cases found that the defendants acted with malice in making their peer review decisions.

Yet this case differs from *Rea* - as well as from the other cases cited by Defendants - in some very key respects.  First, this case involves a physician whose career was decimated by Defendants' actions.  Dr. Poliner practiced emergency cardiac medicine and relied almost solely on emergency room physician referrals for his business.  After being labeled a "dangerous doctor," emergency room doctors stopped referring patients to him, lest they be blamed for sending a patient to an unsafe

14

doctor.  Consequently, Dr. Poliner was unable to sustain any kind of practice at Presbyterian.  Additionally, because Dr. Poliner did not perform unique services that were in high demand, he was unable to take his expertise to another location.  For these reasons, the jury awarded Dr. Poliner a significant amount for damage to career/reputation.

By contrast, in *Rea* the physicians had clinics and privileges at other hospitals in the vicinity and could transfer their work/patients elsewhere in the area.  The type of medicine practiced by the physicians in *Rea* was unique and of a non-emergency nature.  These doctors had no competition in the area; if a patient wanted the medicine they practiced, the patient went to them.  Furthermore, they were not dependent on referrals for their practice.  There was no evidence in *Rea* that the defendants' tortious conduct affected the plaintiffs' careers.

Also in *Rea,* the parties agreed to a bench trial whereas in this case there is a jury verdict to consider.  Because of the strong presumption in favor of affirming jury awards, the Court will try to give effect to the jury's verdict while keeping in mind that the jury's job was to fairly and reasonably compensate Plaintiffs.  *See Bently v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002).

After reviewing the cases cited by Defendants and after conducting its own research, the Court concludes that the Maximum Recovery Rule does not apply in this case because this case involves unique facts and circumstances that are not reflected within the controlling case law.

**4.     Calculation of Damages.**

Because of the unique facts of this case, the Court must identify the maximum verdict supported by the evidence.  *See Smith v. City of Seven Points*, 608 F. Supp. 458, 465 (E.D. Tex. 1985). Compensatory and punitive damages will be considered separately.  *See id.*

a.     *Punitive Damages.*

With regard to punitive damages, Defendants argue that the statutory punitive damages cap established by Section 41.008(b) of the Texas Civil Practices and Remedies Code applies in this case.  Plaintiffs respond that they are entitled to an uncapped award of exemplary damages because section 41.008(c)(11) of the Texas Civil Practices and Remedies Code does not limit the amount of punitive damages where a defendant used deception to secure the execution of a document.

Section 41.008(b) states that "exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000."  Tex. Civ. Prac. & Rem. Code § 41.008(b) (Vernon 1997 & Supp. 2005).  Section 41.008(c) states that the punitive damages cap does not apply to a cause of action "based on conduct described as a felony in the following sections of the Penal Code . . . (11) Section 32.46 (securing execution of document by deception)".  Tex. Civ. Prac. & Rem. Code Ann. § 41.008(11) (Vernon 1997 & Supp. 2005).  At trial, Dr. Knochel testified that he informed Dr. Poliner that Dr. Poliner must agree to a "voluntary" abeyance of his cath lab privileges or Dr. Knochel would terminate all of Dr. Poliner's hospital privileges immediately.  Although Dr. Knochel used coercion and duress to convince Dr. Poliner to sign the abeyance letter and acted in violation of the Hospital's bylaws, there was no evidence or finding that he used deception.  (*See* Jury Question No. 2.)  Thus, Dr. Knochel's conduct could not have constituted a Penal Code violation under Section 32.46.  Further, the cause of action for which Plaintiffs seek recovery - defamation - is not a claim based on securing a document by deception.  Rather, it is a claim based on the publication of a false statement that harmed Plaintiffs' reputation.  For these reasons, the Court concludes that the punitive damages cap

16

applies in this case and therefore, Plaintiffs' punitive damage award is limited to $750,000 plus two times the amount of economic damages against each Defendant.

        b.    *Actual Damages.*

As noted earlier, nearly all of the actual injury suffered by Plaintiffs falls into a nebulous and intangible category that cannot be precisely calculated.  It is difficult to place a price on mental anguish, humiliation and a career/reputation.  The evidence presented did cast some light on the degree of injury suffered as a result of Defendants' statements.  As stated *supra*, Dr. Poliner's career and reputation were obliterated by Defendants' actions.  And Dr. Poliner and his family have endured significant mental anguish.

In light of these and other considerations, and after carefully reviewing the trial transcript and the briefing presented, the Court hereby concludes that the maximum possible recovery for Plaintiff's injuries caused by Dr. Knochel's defamatory statements is $6,000,000 for injury to career and reputation and $6,000,000 for mental anguish.  Likewise, the Court hereby concludes that the maximum possible recovery for Plaintiff's injuries caused by Presbyterian's defamatory statements is $4,500,000 for injury to career and reputation and $4,500,000 for mental anguish.

### *MOTION FOR SETTLEMENT CREDIT*

Defendants argue in their motion for settlement credit that because Plaintiffs suffered one injury, Defendants are entitled to a settlement credit in the amount of the settlement(s) between Plaintiffs and Drs. Harper and Levin.  Defendants cite to the Court's March 26, 2006 Order analyzing the one-satisfaction rule, wherein the Court held that Defendants' unlawful conduct resulted in but one single injury to Plaintiffs.  However, as this Order explained herein, the jury was instructed when considering damage amounts to consider each defendant separately and the jury did

17

so, as indicated by their assessment of different damage amounts against each defendant. Each award represented each defendant's separate contribution to Plaintiffs' single injury. The damage amounts awarded against Dr. Knochel and Presbyterian are entirely separate from the amounts awarded against Drs. Harper and Levin, which have been settled. Therefore, no settlement credit will be given, and Defendants' motion is hereby DENIED.

### *CONCLUSION*

In conclusion, the Court finds that the maximum recovery shown by the evidence in this case against Defendants is $21 million in actual damages and $1,542,106.20 in punitive damages. It is therefore ordered that if Plaintiff agrees to a reduction in actual and punitive damages against Defendants to $22,542,106.20, then Defendants' Motion for New Trial will be DENIED and judgment will be entered in Plaintiffs' favor.

Plaintiffs must indicate acceptance of the remittitur in writing within ten (10) days from the date of this order. If Plaintiffs fail to do so, a new trial limited to the issue of damages will be scheduled.

It is SO ORDERED, this 18th day of September 2006.


JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE